# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| PAUL SHAFER and JOSHUA HARDER | CIVIL ACTION NO.: |
| | 3:12 CV-00039 (AWT) |
| individually and on behalf of all | |
| other persons similarly situated, | |
| | |
| Plaintiffs, | NOVEMBER 7, 2012 |
| | |
| v. | |
| | |
| RODERICK BREMBY, in his | |
| official capacity as Commissioner of | |
| the Connecticut Department of Social | |
| Services, | |
| | |
| Defendant | |

## AFFIDAVIT

The undersigned, Roderick L. Bremby, hereby deposes and says:

1. I am over the age of 18 and I understand the obligation of an oath.

2. I have personal knowledge of the information set forth below.

3. I have served as the Commissioner of the Connecticut Department of Social Services ("Department") since April, 2011.

4. In accordance with section 26 of Public Act 12-1 of the June Special Session, on August 21, 2012, the Department submitted for approval a waiver application under Section 1115 of the Social Security Act, 42 U.S.C. 1315 to the Centers for Medicare and Medicaid Services (CMS) of the United States Department of Health and Human Services.

5. The waiver application proposes certain changes to eligibility criteria for the Medicaid for low-income adults program, also known as HUSKY D, consistent with said Public Act 12-1.

6. Pursuant to 42 CFR 431.416(b), CMS must allow a thirty-day federal comment period on Section 1115 waiver applications. The original comment period expired on October 6, 2012, but was extended to October 20, 2012.

7. On November 5, 2012 the Department received 14 preliminary questions concerning various aspects of the proposed waiver from the federal review team evaluating the waiver application (copy attached.)

8. The Department will respond to these questions as soon as reasonably possible. I anticipate the responses will generate further questions from the federal review team. I cannot predict the length of the evaluation period, as the length of time associated with obtaining waiver approval varies widely depending on a number of factors, including the scope and complexity of the waiver.

9. Upon approval of the waiver application, the Department will implement the eligibility changes as soon as reasonably possible. I anticipate implementation in two phases. For pending and new applications, the new eligibility criteria will be applied immediately. For current recipients of assistance, the new eligibility criteria will be applied three to four months from CMS approval to allow time to solicit and receive the information necessary to make the eligibility determinations.

10. With regard to implementing the eligibility changes for pending applicants, DSS staff will solicit information concerning assets and the income and assets of parents, and the availability and cost of other health insurance options, if appropriate.

11. With regard to current recipients, upon approval of the waiver, DSS will use a contractor to obtain information concerning assets and income and assets and availability of other health insurance options, if appropriate. The contractor will receive this information and perform a preliminary review to determine if clients may be ineligible for ongoing assistance. DSS will review these cases, determine ongoing eligibility, issue adverse action notices and discontinue assistance.

12. The use of a contractor will minimize the operationalization of the new eligibility factors on DSS staff.

13. With regard to implementing software changes to the Department's Eligibility Management System (EMS) to support the implementation of the waiver, the Department will design EMS "work arounds" to avoid costly and time-consuming IT programming that could disrupt modernization efforts underway that are intended to improve Department processing of applications.

14. Exhibit P of Plaintiff's Memorandum in Support of Second Motion for Preliminary Injunctive Relief is a May 3, 2012, email from Louis Polzella, the Department's Director of Information Technology, to Deputy Commissioner Kathleen Brennan and me. Plaintiff relies on this email to conclude that implementing the eligibility changes contemplated by the waiver will take two to three months and will require a three to four month delay in the Department's modernization efforts. This estimate was based on full EMS automation. There are other less intrusive means to implement eligibility changes in EMS that still provide automation, but do not require costly and time consuming IT programming. The Department refers to these means as "workarounds." Workarounds are the re-use of existing EMS data fields and processes to implement new programs instead of building and implementing new program specific logic. The Department has used workarounds throughout the life of EMS. Workarounds are developed by expert EMS users from both the IT and Program Divisions of the Department. The Department decided to use workarounds to implement the waiver in order to provide continued and uninterrupted work on our modernization efforts, as well as the planning work underway for the replacement of EMS.

*[signature]*
Roderick L. Bremby

Sworn and subscribed before me this
7th day of November 2012.

*[signature]* Brenda M. Parnella
~~Notary Public~~/Commissioner of the Superior Court
~~My Commission Expires on:~~


Connecticut Section 1115 Demonstration Proposal
Federal Review Team Questions
November 5, 2012

### Demonstration Eligibility

1. On page 10 of the proposal, the state indicates that it "estimates that 13,381 members will lose eligibility over the proposed demonstration period through December 31, 2013 as a result of the newly proposed eligibility criteria" for the Medicaid for Low-Income Adults (LIA) program.
    a. Please clarify how many individuals the state estimates would lose eligibility as a result of the $10,000 asset test.

    b. Please confirm how many individuals the state estimates would lose eligibility as a result of counting parental income and assets for individuals under age 26 who live with their parents or who are claimed as a dependent on a parent's income tax return.

    c. Please explain how the state arrived at the estimates above. What types of data/information did the state use to arrive at these estimates?

2. On page 6 of the proposal, the state indicates: "Parental income will not, however, be counted if the cost of providing alternative medical coverage to the LIA client represents more than 10 percent of the parent's income." Please provide more information as to how the state would determine whether there is alternative medical coverage.

### Demonstration Benefits

3. Page 16 of the proposal suggests implementation of the nursing facility benefit limit will be subject to further evaluation. What is the status of this evaluation and the state's plan for nursing facility care under the proposed demonstration? Is the state seeking authority at this time to limit the nursing facility benefit to 90 days? If the state is seeking authority to limit the nursing facility benefit, please share answers to the following questions:
    - Please describe the current nursing facility benefit in the LIA program.
    - Please describe how many and what percent of current LIA enrollees have stays in nursing facilities than exceed 90 days.

### Public Comments

4. On pages 14 to 15 of the proposal, the state shared: "DSS received several comments that the demonstration will have an additional negative impact on the workload of state staff and on the current processing of Medicaid eligibility determinations and redeterminations." Please explain if/how the state addressed these comments in the application. Please provide the estimated costs of processing the proposed income and asset verifications during the demonstration period.

### Quality and Evaluation

5. On page 11 of the proposal, the state shares its hypothesis that "Individuals and families with dependents under age 26 are forgoing private or Charter Oak coverage for no-cost Medicaid

Page 1 of 4

LIA coverage, in part, due to the lack of asset or parental income/asset test in LIA." Please provide more background on how the state developed this hypothesis and any data available that demonstrate that 19 to 26 year-old dependents are forgoing private or Charter Oak coverage due to the LIA. Please also provide more information on the Charter Oak program.

**Budget Neutrality**

6. On page 10 of the proposal, the state indicates that it would achieve $100.3 million of savings over the proposed 15-month demonstration period. Please share more information as to how the state arrived at this figure.

7. Please provide the proposed budget neutrality for the demonstration in Excel worksheets. Please provide separate worksheets for 1) State historical data; 2) "without waiver"; and 3) "with waiver" expenditures.

8. Please provide the estimated number of member months for the time period of the demonstration.

9. On page 16 of the proposal, the state shares: "The budget neutrality waiver estimates were developed utilizing a combination actual program data, and where actual information is unavailable, assumptions were made." Please provide a detailed explanation of these assumptions.

**Standard Funding Questions**

10. The following questions are being asked and should be answered in relation to all payments made to all providers under the section 1115 demonstration under review. Section 1903(a)(1) provides that federal matching funds are only available for expenditures made by states for services under the approved state plan.

    a. Do providers receive and retain the total Medicaid expenditures claimed by the state (includes normal per diem, DRG, DSH, fee schedule, global payments, supplemental payments, enhanced payments, capitation payments, other), including the federal and non-federal share (NFS) or is any portion of any payment returned to the state, local governmental entity, or any other intermediary organization?

    b. If providers are required to return any portion of any payment, please provide a full description of the repayment process. Include in your response a full description of the methodology for the return of any of the payments, a complete listing of providers that return a portion of their payments, the amount or percentage of payments that are returned, and the disposition and use of the funds once they are returned to the state (i.e., general fund, medical services account, etc.).

11. Section 1902(a)(2) provides that the lack of adequate funds from local sources will not result in the lowering of the amount, duration, scope, or quality of care and services available under the plan.

   a. Please describe how the NFS of each type of Medicaid payment (normal per diem, DRG, fee schedule, global payments, supplemental payments, enhanced payments, capitation payments, other) is funded.

   b. Please describe whether the NFS comes from appropriations from the legislature to the Medicaid agency, through intergovernmental transfer (IGT) agreements, certified public expenditures (CPEs), provider taxes, or any other mechanism used by the state to provide the NFS. Note that, if the appropriation is not to the Medicaid agency, the source of the state share would necessarily be derived through either an IGT or CPE. In this case, please identify the agency to which the funds are appropriated. Please also indicate if any managed care organizations, prepaid inpatient health plans or prepaid ambulatory health plans participate in IGT or CPE arrangements.

   c. Please provide an estimate of total expenditures and NFS amounts for each type of Medicaid payment.

   d. If any of the NFS is being provided using IGTs or CPEs, please fully describe the matching arrangement, including when the state agency receives the transferred amounts from the local government entity transferring the funds.

   e. If CPEs are used, please describe the methodology used by the state to verify that the total expenditures being certified are eligible for federal matching funds is in accordance with 42 CFR 433.51(b).

   f. For any payment funded by CPEs or IGTs, please provide the following:
      1. a complete list of the names of entities transferring or certifying funds;
      2. the operational nature of the entity (state, county, city, other);
      3. the total amounts transferred or certified by each entity;
      4. clarify whether the certifying or transferring entity has general taxing authority; and
      5. whether the certifying or transferring entity received appropriations (identify level of appropriations).

12. Section 1902(a)(30) requires that payments for services be consistent with efficiency, economy, and quality of care. Section 1903(a)(1) provides for federal financial participation to states for expenditures for services under an approved state Plan. If supplemental or enhanced payments are made, please provide the total amount for each type of supplemental or enhanced payment made to each provider type.

13. Please provide a detailed description of the methodology used by the state to estimate the upper payment limit for each class of providers (state owned or operated, non-state government owned or operated, and privately owned or operated).

14. Does any governmental provider or contractor receive payments (normal per diem, DRG, fee schedule, global payments, supplemental payments, enhanced payments, other) that, in the aggregate, exceed its reasonable costs of providing services?

a.  In the case of MCOs, PIHPs, PAHPs, are there any actual or potential payments which supplement or otherwise exceed the amount certified as actuarially sound as required under 42 CFR 438.6(c)? (These payments could be for such things as incentive arrangements with contractors, risk sharing mechanisms such as stop-loss limits or risk corridors, or direct payments to providers such as DSH hospitals, academic medical centers, or FQHCs.)