## JOINT STIPULATION OF FACTS

## FACTS RELATING TO THE NAMED PLAINTIFFS AND INTERVENORS

### Plaintiff Paul Shafer

1.      Plaintiff Paul Shafer applied for health insurance through the State of Connecticut in July 2011.

2.      DSS sent Mr. Shafer a letter dated September 23, 2011 – more than 45 days after his application was filed.  The letter from DSS said that "[w]e are required to complete work on your case within 45 days," but that "We have been unable to do this because: YOU HAVE NOT YET SENT US THE INFORMATION WE NEED TO DECIDE IF YOU ARE ELIGIBLE AND WE MUST ALLOW YOU TEN DAYS TO GET IT."  The letter also said: "PROOF STILL NEEDED." (Exhibit 1)

3.      This letter did not identify any specific kind of information that DSS needed or which Mr. Shafer had failed to provide.  But it said that "If you do not send us the information by the due date or call your worker for an extension, your application will be denied."    (Exhibit 1)

4.      As of January 10, 2012, the date Mr. Shafer filed his complaint in federal court, Plaintiff Shafer had not received Medicaid through the Low Income Adult program nor had he been sent any notice of denial of these benefits.

5.      On or about January 11, 2012, Mr. Shafer was approved for Medicaid by DSS based on information provided prior to September 23, 2011.

### Plaintiff Joshua Harder

6.      Joshua Harder has been otherwise eligible for Medicaid for about twelve years, but for his income.  Due to having income slightly higher than the limit for Medicaid, he has had to meet a "spend-down" obligation every six months to actually receive Medicaid benefits.

1



Throughout this period, his spend-down has been about $200 every six months.

7.      Joshua Harder claims that one Marguerite Madden (now Margarite Gentile) submitted copies of medical expenses on his behalf to DSS in October, 2011.

8.      On January 11, 2012, the Department attempted to contact Marguerite Madden, the person who Joshua Harder identifies as allegedly having submitted medical bills on his behalf for the July 1 through Dec. 31 of 2011 spend-down period, at Dixwell/Newhallville Mental Health in New Haven.

9.      The Department called Ms. Madden again on January 12, 2012 and January 13, 2012.

10.     On January 13, 2012, the Department sent letters to Ms. Madden at Phoenix CMCS and at Dixwell/Newhallville Mental Health requesting that Ms. Madden contact DSS.

11.     On January 23, 2012, Ms. Madden, now known as Ms. Gentile, contacted Ms. Cathy Robinson-Patton of DSS.  Ms. Gentile claimed that she brought in bills to the DSS New Haven office on October 14, 2011 and put them in the slotted internal drop box, located in the office reception area.

12.     When the Department was informed of the claims that are being asserted by Mr. Harder in this lawsuit, a search was conducted of Mr. Harder's records for any evidence that medical bills were submitted in October 2011 as claimed.   The search did not disclose that any medical bills were submitted by or on behalf of Mr. Harder in October 2011 as claimed. Specifically, the Department's records did not disclose any medical bills similar to the bills that were eventually submitted by Ms. Gentile in January 2012, at the specific request of the Department after the lawsuit had been filed.

13.     On October 26, 2011, an EMS notice was mailed by the EMS system to Joshua

2

Harder with a redetermination form and instructions to return the form by November 20, 2011.

14.     On December 9, 2011, an EMS notice was mailed by the EMS system, to Joshua Harder advising him of the new January 2012 through June 2012 spend-down period and medical expense amount of $244.68 necessary to become eligible for that period.

15.     The Department disputes Mr. Harder's claims that his case manager, Ms. Gentile, submitted medical bills on his behalf in October, 2011.

**Intervenor Mouanodji Mbaissouroum**

16.     Intervenor Plaintiff Mouanodji Mbaissouroum submitted an application for Medicaid for himself and his family through the state's HUSKY A program on November 7, 2011. He supplied copies of the requested verification documents and was issued a receipt for those documents by DSS on November 7, 2011.

**17.**     On December 23, 2011, Mr. Mbaissouroum received a letter from DSS confirming that he applied for Medicaid on November 7, 2011. The letter also stated that, although DSS was required to complete work on his case within 45 days, it was unable to do so. Forty-five days from the date he applied for assistance would have been December 22, 2011. The letter instructed him to call his caseworker for an explanation of the delay.

**Intervenor Antonio Cardoso**

18.     Intervenor Plaintiff Antonio Cardoso applied for Medicaid on February 28, 2012; specifically he applied for the Medicaid portion of the Connecticut Home Care Program for Elders.

19.     As of the date of the filing of the motion to intervene, May 3, 2012, Mr. Cardoso had not been approved for Medicaid and had not received a notice of denial of those benefits.

3

20.     DSS subsequently granted Mr. Cardoso's application for Medicaid, more than 60 days after he applied for Medicaid.

## FACTS RELATING TO CLASS ACTION MOTION

21.     Plaintiffs have requested certification of a class consisting of the following individuals:

> All Connecticut residents who have applied, or who in the future will apply, for Medicaid benefits administered by the Connecticut Department of Social Services and who have not been provided such benefits.

22.     Plaintiffs propose two subclasses, consisting of:

> (1) Individuals who have applied or will apply for Medicaid (the "Applicant" subclass).
>
> (2) Individuals who have been or will be found eligible for Medicaid subject to a spenddown requirement (the "Spend-down" class).

23.     Over the course of the last 12 months, the average number of applications for Medicaid filed each month has been over 20,000. Each of these applications represents at least one person. Between March 2012 and February 2013, there were an average of 12,703 applications for Medicaid pending at the end of each month, of which an average of 7,091 applications each month -- 56% of the total pending at the end of each month – had been pending for more than the applicable deadline set by federal law.

24.     Similarly, there are hundreds of individuals in the Spend-Down class each month. These are individuals who have been found to meet all Medicaid eligibility requirements except for having income above the Medicaid limits, and who thus are subject to a spend-down requirement. In each successive six month period that these individuals submit sufficient

4

unreimbursed medical expenses in an amount sufficient to meet the individual's spend-down requirement, they will qualify to receive Medicaid benefits for any additional covered medical expenses incurred in the six month period.

25.     The named plaintiffs are represented by attorneys from New Haven Legal Assistance Association, Inc. Counsel is experienced in federal class action litigation. *See, e.g., Rabin v. Wilson-Coker*, 362 F.3d 190 (2d Cir. 2004); *Karen L. v. Physicians Health Services, Inc.*, 202 F.R.D. 94,102 (2001); *Ladd v. Thomas*, 962 F. Supp. 284 (D. Conn. 1997). Counsel will vigorously prosecute this action and will protect the interests of the class members.

26.     In addition, the named plaintiffs have no interests antagonistic to those of the proposed classes. There is no potential for conflict in attempting to secure for those similarly situated the same statutory rights to which the named plaintiffs believe they are entitled. *See Eisen v. Carlisle & Jacquelin*, 391 F.2d at 561-62.

## FACTS RELATING TO CONNECTICUT MEDICAID PROGRAM

### Medicaid Programs Generally

27.     Medicaid is a jointly-funded state and federal program enacted in 1965 under Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq,*. The program primarily serves low income children and parents, and elderly, disabled and other low income adults. Medicaid provides a broad array of health and long-term care services, including but not limited to physicians' services, hospital services (inpatient and outpatient), laboratory and x-ray services, prescription drugs, family planning services, vision services, and durable medical equipment.

28.     State participation in the Medicaid program is optional. However, a state choosing to participate, and thereby receiving federal matching funds for its Medicaid program, must

comply with the requirements of the federal Medicaid Act, and the regulations governing state Medicaid programs.

29.     Connecticut has chosen to participate in the Medicaid program and accepts 50% federal matching funds for its program expenditures. Once Connecticut elected to participate in the Medicaid program, it became obligated to administer its program pursuant to a state plan approved by the Center for Medicare and Medicaid Services ("CMS") that complies with the requirements set forth in the Medicaid Act and its implementing regulations. The provisions of the Connecticut state Medicaid plan are mandatory with respect to all political subdivisions in the state.  42 U.S.C. § 1396a(a)(1).

30.     The state Department of Social Services is the "single state agency" charged with the administration of the Medicaid program in Connecticut, including eligibility determinations 42 U.S.C. § 1396a(a)(5). The defendant Commissioner is the head of the Department of Social Services.

31.     The Connecticut Medicaid program includes different coverage groups, the primary ones being HUSKY A (children, families with minor children and pregnant women), HUSKY C (Medicaid for the Aged, Blind and Disabled) (adults who are aged, blind, or disabled), and HUSKY D (Medicaid for Low Income Adults) (all other adults). (There is also a small group which receives Limited Benefits.)  There are approximately 612,000 individuals enrolled in these programs in total.  The overwhelming majority of current Medicaid recipients, about  426,000, are in the HUSKY A coverage group. Children under 19 are approximately 65% of the current HUSKY A Medicaid population, representing about 277,000 of the total HUSKY A enrollees.  There are about 186,000 persons in the HUSKY C, HUSKY D, and Limited Benefits coverage groups.

6

32.     The income limit for HUSKY A is 185% of the Federal Poverty Level. Therefore, for a family of 4, the current income limit is $43,567 per year. The income limit for HUSKY C and D is based on the Medically Needy Income Limit, which, for single persons, is $512.05 or $623.77, depending on the region of the state in which the recipient lives. This is equivalent to only 54% or 66% of the Federal Poverty Level, respectively, exclusive of any applicable income disregards. (Agreed)

33.     Under federal Medicaid law, states are required to "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). Under the implementing regulations, Medicaid applications must be processed, and eligibility determined, within 45 days, 42 C.F.R. § 435.911(a)(2), or within 90 days if eligibility is based on disability, 42 C.F.R. § 435.911(a)(1), unless "unusual circumstances" are present. 42 C.F.R. § 435.911(c).

**Medically Needy Spend-Down Program**

34.     Individuals who are otherwise eligible for Medicaid assistance except for excess income ("medically needy") may become eligible based on consideration of incurred medical and remedial expenses that are not subject to payment by a third party. Eligibility can be established if sufficient, allowable incurred medical and remedial expenses are submitted in successive six month spend-down periods that are sufficient in amount to reduce the individual's excess countable income to the applicable Medically Needy Income Limit ("MNIL").

35.     Individuals who fall into this category are advised by DSS in writing that they are eligible for Medicaid subject to satisfaction of a particular spend-down amount for a given six month period. UPM § 5520.25.B., B.3.a.

7

36.     These notices advise the spend-down individuals that their Medicaid benefits will be activated upon the presentation of any qualifying medical expenses for the current six month period, or any unpaid medical expenses from a previous period, meeting or exceeding their particular spend-down amount, and that, upon such submission, they will be eligible for Medicaid benefits until the end of that six month period -- at which point a new spend-down period will begin with potentially a different spend-down amount. In response to these notices, individuals routinely present medical expenses to demonstrate satisfaction of their respective spend-down amounts and activate Medicaid benefits.

37.     The submitted expenses are not paid by DSS, but are used to determine if the client has incurred a sufficient amount of medical and remedial expenses to close the gap between the excess household income and the MNIL.  In short, submitted proof of allowable medical expenses "spends down" this gap.  When the gap is met, the case status changes from being in spend-down to active status, with the Department paying any additional medical expenses incurred over the six-month spend-down period.

38.     When a spend-down obligation is satisfied in a six-month spend-down period, the Department may cover any additional bills that were incurred in the spend-down period (or were incurred in a prior period but not previously counted for spend-down purposes).  In other words, assistance can be paid retroactively for expenses that were incurred prior to the date on which the Department determined that the spend-down application had been satisfied.

39.     The spend-down process consists of five distinct requirements:  (a) the expenses must be a medical or remedial expense; (b) the expense must actually have been incurred by the individual with the services actually having been provided (as opposed to an "estimate" or a proposal for services that have not yet been provided); (c) the expenses must not be reimbursable

8

by a third party, which requires that the Department know whether the individual is covered by a separate third party insurer and to what extent the insurer will pay a claim which may or may not have been submitted to the insurer; (d) if the expenses was incurred prior to the current spend-down period, whether it has been paid; and (e) whether the expense was incurred by a household member whose income was included in the spend-down calculation.

40.      Some expenses can be processed quickly when the submitted material demonstrates on its face that all requirements for being counted have been met – the expenses are clearly medical or remedial in nature, are recent and, based on date of service, could not have been previously submitted in a prior spend-down period, and documentation concerning any third party payers has been submitted.

41.      Spend-down clients have a six-month period of eligibility during which they can send in documentation of other medical or remedial expenses.  Problems and delays occur when there is doubt over the validity of the expense submitted, if the expense does not clearly indicate the nature of the service provided (perhaps due to medical or clinical terminology), when billing format is not easily discernible, or if it is suspected that an expense may have already been submitted and requires a search among other similar expenses.  When such questions or concerns arise, telephone calls and/or written requests for clarification are made by eligibility staff or a DSS contractor acting on DSS' behalf.

42.      Clients also sometimes submit receipts from varied retailers such as Walgreen's, CVS, Target, and Wal-Mart that are not easily identifiable as medically related.  The client then must be contacted to determine the nature of the expense and if it is related to an actual medical condition.  In the case of store receipts for over the counter purchases, there is sometimes

9

concern as to whether this was a client-incurred expense as purchases can be paid in cash and the paper receipt does not include information linking it to the client.

43.     Upon receipt of an expense, a worker must sort through all submitted documentation to determine whether the expense qualifies to reduce the spend-down amount, including:

a.     is the expense submitted a medical expense that is allowed to be applied toward the spend-down;

b.     did the client actually incur the expense or is the expense an estimate;

c.     has the expense been previously applied to a past spend-down period (in which  case, it would not be counted);

d.     are the expenses submitted by multiple medical providers and collection agencies separate expenses or duplicate documentation for the same service;

e.     has the expense been reimbursed by third-party insurance;

f.     if the expense was incurred prior to the current spend-down period, whether it has  been paid; and

g.     whether the expense was incurred by a household member whose income is included in the spend-down calculation.

44.     Determining whether an expense has been previously submitted and counted for spend-down eligibility in a prior eligibility period is sometimes time consuming.  A worker must research back in time to establish if an expense has already been used in a prior spend-down period.  This can be especially time consuming if charges are submitted from multiple providers, from collection agencies or other entities who do not also submit accurate dates of service, itemized expense listings or note where the service was provided.

45.     When a client with third-party insurance does not submit proof that the expense has been submitted to the insurer or does not verify the amount that remains unpaid and owed by

10

the client, the worker is required to follow-up and verify that the expense is not reimbursable by a third party payer.

## FACTS RELATING TO DSS PROCESSING OF MEDICAID APPLICATIONS

### Alvarez/Intake Reports

46.     The Department's Eligibility Management computer system (EMS) has, for at least the last two decades, collected data on the length of time that Medicaid applications pended. These numbers are collected at the end of each calendar month and are reported on a monthly basis for both regional offices and statewide. The report is called the Application Length Pending Report .

47.     Based on data maintained by EMS, DSS currently generates a monthly Intake Report (also known as the "*Alvarez* Report") that tracks the total number of applications received but not yet processed (also known as "pending") at the end of each month and the number of such pending applications that are "overdue" by reference to the applicable standard of promptness. Exhibits 127-152

48.     The Intake Report counts the total number of Medicaid applications pending at the end of the month and the number of pending Medicaid applications that are overdue at that moment in time according to the applicable standard of promptness. Exhibits 127-152; Exhibit 153.

49.     The Intake Report shows the percentage of Medicaid applications pending at the end of the month that are overdue out of the total applications that have yet to be processed at that moment in time when the report is run.     Exhibits 127-152; Exhibit 153

50.     The Intake Report tallies the number of applications yet to be processed at the moment in time when the report is run. Exhibits 127-152; Exhibit 153

51.    The Intake Report does not report the number of Medicaid applications DSS

actually receives within a month Exhibits 127-152; Exhibit 153.

52.    The chart below shows the number of Medicaid applications pending at the end of

month, the number of overdue pending Medicaid applications, and the percentage of the total

pending Medicaid applications that are overdue. These numbers are drawn from the *Alvarez*

Intake Reports from January 2011 through February 2013:

| Month/Year | Medicaid applications pending at month end | Medicaid applications pending at month end that are "overdue" (not yet completely processed but beyond the time standard) | Medicaid applications pending at month end that are coded by DSS as overdue for "excused" delay | % of total pending Medicaid applications at month end that are overdue out of the total pending Medicaid applications at month end | % of pending Medicaid applications that are overdue and are coded by DSS as "unexcused" delay |
|---|---|---|---|---|---|
| Jan 2011 | 10,100 | 4,823 | 4,300 | 48 % | 5% |
| Feb 2011 | 10,634 | 4,839 | 4,246 | 45.5% | 6% |
| Mar 2011 | 10,968 | 4,682 | 4,155 | 43% | 5% |
| Apr 2011 | 11,126 | 4,845 | 4,374 | 43.5% | 4% |
| May 2011 | 10,616 | 4,599 | 4,208 | 43% | 4% |
| Jun 2011 | 10,628 | 4,956 | 4,460 | 47% | 5% |
| Jul 2011 | 10,924 | 5,018 | 4,516 | 46% | 5% |
| Aug 2011 | 10,891 | 5,530 | 4,867 | 51% | 6% |
| Sep 2011 | 11,071 | 5,650 | 4,852 | 51% | 7% |
| Oct 2011 | 12,179 | 5,871 | 5,084 | 48% | 6% |
| Nov 2011 | 12,580 | 6,896 | 5,985 | 55% | 7% |
| Dec 2011 | 13,287 | 7,595 | 6,537 | 57% | 8% |
| Jan 2012 | 13,555 | 7,714 | 6,473 | 57% | 9% |
| Feb 2012 | 13,606 | 8,396 | 6,906 | 62% | 11% |
| Mar 2012 | 13,730 | 8,516 | 6,591 | 62% | 14% |
| Apr 2012 | 13,584 | 8,711 | 6,542 | 64% | 16% |
| May 2012 | 14,637 | 10,189 | 7,808 | 70% | 16% |
| Jun 2012 | 15,222 | 9,582 | 7,144 | 63% | 16% |
| Jul 2012 | 13,994 | 8,194 | 5,911 | 59% | 16% |
| Aug 2012 | 13,186 | 7,275 | 5,094 | 55% | 17% |

| Sep 2012 | 13,008 | 7,226 | 5,056 | 56% | 17% |
|----------|--------|-------|-------|-----|-----|
| Oct 2012 | 12,774 | 7,008 | 5,092 | 55% | 15% |
| Nov 2012 | 12,367 | 5,973 | 4,645 | 48% | 11% |
| Dec 2012 | 10,793 | 5,088 | 4,124 | 47% | 9% |
| Jan 2013 | 10,246 | 3,926 | 2,974 | 38% | 9% |
| Feb 2013 | 8,906 | 3,410 | 2,393 | 38% | 11% |

53.     In response to Plaintiffs' Motion for Preliminary Injunction, DSS "acknowledges that even under its current reporting, (which plaintiffs claim to be inaccurate), the percentage of unexcused, delayed Medicaid applications is unacceptable, and if plaintiffs have an enforceable right to timely application processing, DSS is not currently as of April, 2012, in substantial compliance with its Alvarez stipulation, or with any such 'right.'" Defendant's Memorandum in Opposition to the Motion for a Preliminary Injunction [Doc. 25] at p. 17.

54.     Between July 2011 and February 2013, the percentage of overdue applications pending at the end of a given month that were overdue has ranged from 70% in May 2012 when the Department reported that over 10,000 pending applications were overdue, to 38% in February 2013.

55.     Between March 2012 and February 2013, there were an average of 7,091 overdue applications each month -- 56% of the average total pending at the end of each month.

56.     Of the 3,410 pending Medicaid applications that were overdue at the end of February 2013, 1,316 were long term care applications and 617 were Medicaid waiver applications, meaning that 56% of all overdue pending Medicaid applications at the end of February 2013 were attributable to long term care or Medicaid waiver applications. Exhibit 152; Exhibit 179; Exhibit 180.

57.     At the end of February, 2013, there were 3,410 pending overdue applications pending statewide, representing 38% of the total applications pending on the day the report was

13

run.  There was significant variation among the regional offices, with the Middletown regional office reporting that 5% of its pending applications were overdue at the end of February (32 applications out of 662), while the Hartford regional office reported that 827 of its 1,453 pending applications, or 57% of its pending applications, were overdue at the end of February.

58.      The percentage of pending overdue Medicaid application as counted by the Intake Reports has dropped from 62% in February 2012 to 38% in February 2013.  The total number of pending overdue Medicaid applications has dropped from 8,936 in February 2012, down to 3,410 in February 2013, a 59% drop and a two-year low.  Exhibit 140; Exhibit 152.

59.      The number of pending Medicaid applications that are overdue at the end of the month has decreased by nearly 30% since January 2011; in January 2011, 4,823 Medicaid applications that were pending at the end of the month were overdue whereas in February 2013, 3,410 Medicaid applications that were pending at the end of the month were overdue.  Exhibit 127; Exhibit 154; Exhibit 152.

60.      The percentage of total pending Medicaid applications at the end of month that are overdue has decreased from 48% in January 2011 to 38% in February 2013.  Exhibit 127; Exhibit 154; Exhibit 152.

**Application Length Pending (Dispositions) Reports**

61.      The Commissioner's EMS Application Length Pending Report also provides data on the number of Medicaid applications which are disposed of in a given month and the length of time that application pended before disposition (within a range of dates).  As with data on overdue pending applications, this disposition data is collected at the end of each month and is reported on a monthly basis for all regional offices and for the state as a whole.

62. When a Medicaid application is granted or denied 46 days or more after it was initially filed, it is not necessarily processed outside of the applicable standard of promptness. The standard of promptness for Medicaid applications based on disability is 90 days, not 45 days. Exhibit 153.

63.     Only a relatively small percentage of Medicaid applications are based on disability (and thus subject to the longer 90 day timeframe). The majority of Medicaid applications are subject to the 45 day federal time requirement.

64.     The Department's total disposition figures show that, throughout each calendar month of 2012, between 30 and 34% percent of the Medicaid applications disposed of during a calendar month had pended for more than 45 days at the time of disposition.

65.     The Application Length Pending Report shows actions taken by DSS on Medicaid applications during a calendar month, as well as the number of days each application pended (within a range of days) until disposition.     Exhibit 153; Exhibits 154-179.

66.     The Application Length Pending Report shows the number of Medicaid applications granted, denied, granted spend-down, cancelled, withdrawn, and the total of these adjudications made during a month, as well as the number of days each application pended (within a range of days) until disposition.     Exhibit 153; Exhibits 154-179.

67.     The Application Length Pending Report does not take into account the reasons why pending applications are not processed within the standard of promptness.     Exhibits 154-179.

68.     The Application Length Pending Report separately counts the number of State Supplement applications from the number of traditional Medicaid applications.     Exhibits 154-179.

15

69.      Below is a chart of statewide data taken from the relevant month EMS

Application Length Pending Report pp. 239-252 showing the numbers of grants and denials of

Medicaid applications, and those made  more than 45 days after submission of the Medicaid

application,  during the months of June, 2011, February 2012, May 2012, November, 2012, and

February 2013:

Application Length Pending (Dispositions) Report

| Month | Number of Appls. Granted (excl. State Supp) | Number of Appls. Granted More than 45 days after Subm. | % of Granted Applications Granted More than 45 days after Subm. | Number of Appls Denied (excl. State Supp | Number of Appls Denied more than 45 days after Subm. | % of Denied Applications Denied More than 45 days after Subm. | Total Number of Appls Granted or Denied after Subm. | Total Number of Granted or Denied (excl. State Supp) More than 45 Days after Subm. | % of Total Applications Granted or Denied that were Granted or Denied More than 45 days after Subm. |
|---|---|---|---|---|---|---|---|---|---|
| Jun-11 | 17,754 | 1,982 | 11% | 3,314 | 1,453 | 44% | 21,068 | 3,435 | 16 |
| Feb-12 | 14,238 | 3,498 | 25% | 3,151 | 1,839 | 58% | 17,389 | 5,337 | 31 |
| May-12 | 14,005 | 3,133 | 22% | 3,104 | 1,860 | 60% | 17,109 | 4,993 | 29 |
| Aug-12 | 19,413 | 4,858 | 25% | 3,975 | 2,388 | 60% | 23,388 | 7,246 | 31 |
| Nov-12 | 17,747 | 4,063 | 23% | 5,185 | 3,186 | 61% | 22,932 | 7,249 | 32 |
| Feb-13 | 15,025 | 2,485 | 17% | 3,381 | 1,542 | 46% | 18,406 | 4,027 | 22 |
|  |  |  |  |  |  |  |  |  |  |

70.     According to the Application Length Pending  (Dispositions) Reports, in February 2012, DSS granted 14,238 Medicaid applications (excluding State Supplement).  Of the granted applications, 3,498 were granted 46 days or more after the application was initially filed. Additionally, in February 2012, DSS denied 3,151 Medicaid applications (excluding State Supplement).  Of the denied applications, 1,839 were denied 46 days or more after the application was initially filed.  Exhibit 167

71.     According to the Application Length Pending Reports, in May 2012, DSS granted 14,005 Medicaid applications (excluding State Supplement).  Of the granted applications, 3,133 were granted 46 days or more after the application was initially filed.  Additionally, in May 2012, DSS denied 3,104 Medicaid applications (excluding State Supplement).  Of the denied applications, 1,860 were denied 46 days or more after the application was initially filed.  The Application Length Pending Report does not identify the reasons why actions were taken after the 45th day.  Exhibit 170.

72.     According to the Application Length Pending Reports, in August 2012, DSS granted 19,413 Medicaid applications (excluding State Supplement).  Of the granted applications, 4,858 were granted 46 days or more after the application was initially filed. Additionally, in August 2012, DSS denied 3,975 Medicaid applications (excluding State Supplement).  Of the denied applications, 2,388 were denied 46 days or more after the application was initially filed.  Exhibit 173

73.     According to the Application Length Pending Reports, in November 2012, DSS granted 17,747 Medicaid applications (excluding State Supplement).  Of the granted applications, 4,063 were granted 46 days or more after the application was initially filed. Additionally, in November 2012, DSS denied 5,185 Medicaid applications (excluding State

18

Supplement). Of the denied applications, 3,186 were denied 46 days or more after the application was initially filed. Exhibit 176.

74.     According to the Application Length Pending Reports, in February 2013, DSS granted 15,025 Medicaid applications (excluding State Supplement). Of the granted applications, 2,485 were granted 46 days or more after the application was initially filed. Additionally, in February 2013, DSS denied 3,381Medicaid applications (excluding State Supplement). Of the denied applications, 1,542 were denied 46 days or more after the application was initially filed. Exhibit 179.

75.     In February 2013, there were 1,013 fewer Medicaid applications granted 46 days or more after the application was initially filed than in February 2012. This means that in February 2013, 29% fewer Medicaid applications were granted 46 days or more after the application was initially filed than in February 2012. Exhibit 167; Exhibit 179.

76.     In February 2013, there were 297 fewer Medicaid applications denied 46 days or more after the application was initially filed than in February 2012. This means that in February 2013, 16% fewer Medicaid applications were denied 46 days or more after the application was initially filed than in February 2012. Exhibit 167; Exhibit 179.

77.     The Application Length Pending Report does not count the number of Medicaid applications DSS receives in a month.     Exhibits 154-179.

**Medicaid Timeliness Report**

78.     Between November 2012 and January, 2013, DSS developed a new report for measuring the timeliness of its processing of Medicaid applications filed within a given calendar month. This report is referred to by the parties as the Medicaid Timeliness Report (as distinct

from the Alvarez/Intake Report and the Application Length Pending (Disposition) Report). As with the other two reports, the Medicaid Timeliness Report is based on data collected by DSS' Eligibility Management System. (Exhibit 181)

79.     The Medicaid Application Timeliness Report (hereinafter "Timeliness Report") looks at an application's case status once the applicable standard of promptness has expired. The standard of promptness for most Medicaid applications is 45 days; the standard of promptness for Medicaid applications based on disability is 90 days.

80.     In order to definitively know if an application has been processed within the federal time standard, DSS must wait until the applicable time standard has passed. (Exhibit 153)

81.     The Timeliness Report shows the number of HUSKY applications (excluding HUSKY B), Long Term Care Medicaid applications, and Medicaid-related State Supplement applications DSS receives within each month. The Timeliness Report determines the time processing percentage by tracking each of the applications received in the month and after the standard of promptness has passed for all of the applications filed within the month, reporting how many were processed within the standard of promptness. (Exhibit 153, Exhibit 181)

82.     The Timeliness Report aggregates applications on a monthly basis based on the date of the application. (Exhibit 153)

83.     The Timeliness Report separately shows the percentage of timely processed applications for State Supplement and Long Term Care Medicaid, including applications for home and community based waiver services. (Exhibit 153, Exhibit 181)

84.     The percentages of timely processing of applications contained in the Timeliness Report does not currently take into account the causal factors for applications that are not

20

processed within the appropriate time standard, specifically whether any delay is "excused" due to unusual circumstances. (Exhibit 153, Exhibit 181)

85.      Because the Timeliness Report aggregates applications on a monthly basis, the Timeliness Report will always show application processing information that is several months old. (Exhibit 153)

86.      In order to determine whether all applications received in a particular month have been processed timely, DSS must wait until the time standard for the last application received in that month has ended in order to determine if that application was processed within the time standard. (Exhibit 153)

87.      The chart below shows the number of applications received for specified Medicaid programs for the time period July 2011 to November 2012 and the number of applications (within those programs and total number of applications) which were timely processed within the applicable standard of promptness for each month. These numbers are taken from the current Medicaid Timeliness Report and earlier versions of the report produced by DSS:

Monthly Application Data rom Medicaid Timeliness Report

| Month | HUSKY* | | | Long Term Care | | | State Supplement | | | Husky D** | | | Total For All Programs | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps Received | Timely Processed | % Timely | Apps Received | Timely Processed | % Timely | Apps Received | Timely Processed | % Timely | Apps Receive d | Timely Processed | % Timely | Total Applications Received For All Progams | Total Timely Processed | % Timely |
| Jul-11 | 21,909 | 18,760 | 85.63% | 1,164 | 448 | 38.49% | 896 | 764 | 85.27% | 7,655 | 6,135 | 80.14% | 23,969 | 19,972 | 83.32% |
| Aug-11 | 23,013 | 17,893 | 77.75% | 1,357 | 536 | 39.50% | 931 | 786 | 84.43% | 8,474 | 6,436 | 75.95% | 25,301 | 19,215 | 75.95% |
| Sep-11 | 22,174 | 16,872 | 76.09% | 1,323 | 522 | 39.46% | 875 | 737 | 84.23% | 8,205 | 5,978 | 72.86% | 24,372 | 18,131 | 74.39% |
| Oct-11 | 23,379 | 17,404 | 74.44% | 1,282 | 503 | 39.24% | 898 | 740 | 82.41% | 9,022 | 6,617 | 73.34% | 25,559 | 18,647 | 72.96% |
| Nov-11 | 22,390 | 16,001 | 71.46% | 1,190 | 471 | 39.58% | 840 | 687 | 81.79% | 8,330 | 5,889 | 70.70% | 24,420 | 17,159 | 70.27% |
| Dec-11 | 21,945 | 15,769 | 71.86% | 1,249 | 488 | 39.07% | 887 | 726 | 81.85% | 8,059 | 5,703 | 70.77% | 24,081 | 16,983 | 70.52% |
| Jan-12 | 23,082 | 16,607 | 71.95% | 1,256 | 477 | 37.98% | 812 | 620 | 76.35% | 9,324 | 6,410 | 68.75% | 25,150 | 17,704 | 70.39% |
| Feb-12 | 21,218 | 15,062 | 70.99% | 1,299 | 507 | 39.03% | 813 | 604 | 74.29% | 8,340 | 5,520 | 66.19% | 23,330 | 16,173 | 69.32% |
| Mar-12 | 22,390 | 16,002 | 71.47% | 1,392 | 535 | 38.43% | 891 | 681 | 76.43% | 9,133 | 6,084 | 66.62% | 24,673 | 17,218 | 69.78% |
| Apr-12 | 21,499 | 15,900 | 73.96% | 1,290 | 501 | 38.84% | 755 | 588 | 77.88% | 8,425 | 5,798 | 68.82% | 23,544 | 16,989 | 72.16% |
| May-12 | 21,905 | 16,038 | 73.22% | 1,176 | 462 | 39.29% | 887 | 675 | 76.10% | 8,815 | 6,041 | 68.53% | 23,968 | 17,175 | 71.66% |
| Jun-12 | 22,611 | 16,905 | 74.76% | 1,312 | 512 | 39.02% | 875 | 684 | 78.17% | 8,712 | 6,129 | 70.35% | 24,798 | 18,101 | 72.99% |
| Jul-12 | 23,766 | 17,964 | 75.59% | 1,336 | 542 | 40.57% | 877 | 685 | 78.11% | 9,098 | 6,555 | 72.05% | 25,979 | 19,191 | 73.87% |
| Aug-12 | 25,848 | 19,589 | 75.79% | 1,290 | 503 | 38.99% | 940 | 743 | 79.04% | 9,852 | 6,918 | 70.22% | 28,078 | 20,835 | 74.20% |
| Sep-12 | 22,804 | 17,851 | 78.28% | 1,129 | 454 | 40.21% | 825 | 691 | 83.76% | 8,637 | 6,270 | 72.59% | 24,758 | 18,996 | 76.73% |
| Oct-12 | 23,204 | 19,080 | 82.23% | 1,258 | 535 | 42.53% | 837 | 745 | 89.01% | | | | 25,299 | 20,360 | 80.48% |
| Nov-12 | 22,895 | 19,244 | 84.05% | 1,220 | 518 | 42.46% | 851 | 784 | 92.13% | | | | 24,966 | 20,546 | 82.30% |
| *Includes Husky D but does not include Long Term Care Medicaid or State Supplement Applications | | | | | | | | | | | | | | | |
| ** As of October 2012, DSS no longer counts Husky D separately | | | | | | | | | | | | | | | |

88.     The Timeliness Report shows that for the most recent calculable month, November 2012, DSS received 22,895 Medicaid applications (excluding Long Term Care Medicaid and State Supplement Applications) and 19,244 of those applications were processed within the time standard. Therefore, 84.05% of Medicaid applications (excluding Long Term Care, Medicaid and State Supplement applications) received in November 2012 were processed within the program's time standard. Exhibit 181.

89.     From November 2011 through November 2012, 222,012 out of 295,557 filed applications (excluding long term care and state supplement applications), or 75.12% were processed within Medicaid time standards.     Exhibit 181.

90.     From November 2011 through November 2012, 6,505 out of 16,397 filed applications for long-term care, or 39.67% were processed within Medicaid time standards. Exhibit 181.

91.     From November 2011 through November 2012, 237,430 out of 323,044 filed applications, including long-term care and State Supplement, or 73.50%, were processed within Medicaid time standards.     Exhibit 181.

92.     Only its timeliness rate for HUSKY C Long Term Care applications increased and that was only by 3.97%. However, even in November, 2012, the percentage of such applications that were timely processed in a given month was only 42.46%

**FACTS RELATING TO THE PROCESSING OF SPEND-DOWN MEDICAL EXPENSES**

93.     In order to relieve DSS eligibility workers of the administrative burden of reviewing medical expenses to determine an individual's "medically needy" status and in order to speed up the eligibility determination in such cases, the Department contracted with XEROX, effective September 2012, to assume administrative responsibility for reviewing medical expenses

23

on the Department's behalf, in accordance with the Department's eligibility policies and the performance standards specified in the contract.

94.     If XEROX preliminarily determines that the medical expenses are sufficient to satisfy an individual's spend-down amount, the case is forwarded to the Defendant for further processing. A DSS eligibility worker must then conduct an independent assessment of whether the individual has satisfied his or her spend-down obligation, because only a DSS worker may determine Medicaid eligibility and activate the individual on Medicaid. 42 U.S.C. § 1396a(a)(5); Conn. Gen. Stat. §17b-261b(a).

95.     XEROX's review of medical expenses on DSS' behalf is described in the documents entitled "DSS/XEROX Spend-Down Project," Exhibit103, and "XEROX DSS Spend-Down Processing," Exhibit 104. Generally:

(a)     DSS provides XEROX with a computer file listing of all "medically needy" individuals who could become eligible in a six-month spend-down period upon the submission of sufficient qualifying medical expenses (and periodically updates the file of such individuals);

(b)     XEROX sent an introductory informational letter (and periodically sends new introductory letters) to all medically needy clients generally advising them how the spend-down process works and stating that all medical expenses should henceforth be sent to the HUSKY Spend-down Processing Center (staffed by XEROX employees) in provided envelopes, with the client name and identification number provided. Exhibit 105;

(c)     the DSS-XEROX contract requires XEROX to process submitted medical expenses within 5 business days of their receipt by XEROX for non-emergency cases (3 days for emergency cases);

24

(d)        XEROX is required to determine whether the submitted expenses qualify or do not qualify for spend-down purposes (including expenses that do not qualify, based upon information submitted but could qualify if additional information is provided) and whether the qualifying medical expenses are sufficient to satisfy the client's spend-down obligation or not;

(e)        XEROX, on DSS' behalf, mails the client either a form advising the client that the submitted expenses do not qualify for spend-down consideration, Exhibit 106, or that the submitted expenses qualify for spend-down, but that the allowed expenses by themselves are insufficient to reduce the client's "excess income" to the MNIL, such that the client will not become eligible for medical assistance payments unless and until additional, qualifying medical expenses are submitted. Exhibit 107. Both notices contain hearing notices advising the client of his or her right to request an administrative fair hearing to contest the determination;

(f) if XEROX determines on the Department's behalf that the submitted expenses qualify for spend-down and that they are sufficient in dollar amount to reduce the client's countable income to the MNIL, XEROX sends a "Potentially Eligible" referral form to a designated "Spend-Down Liaison" in each DSS Regional Office in order for the DSS liaison to review the information provided by XEROX and activate the client's eligibility for assistance in the Department's eligibility management system (EMS); Exhibit 108.

(g)        the Department provides for the Department's activation of the client's eligibility in EMS (when eligibility is established) to also be accomplished within the 5 business days allowed for XEROX to make an initial eligibility determination. Exhibit 103. When the client's eligibility is activated, the client receives a notice, Exhibit 109; from DSS informing him or her of that fact and advising of hearing rights; and

       (h)      the 5 business day contractual standard commences once the submitted expenses are received by XEROX. In those cases where the client does not follow instructions and submits the expenses directly to a DSS Regional Office (instead of to the HUSKY Spend-down Processing Center staffed by XEROX), the spend-down project affords DSS an additional 3 business days to forward the submitted medical expenses to XEROX.

    96.      An analysis of the time it takes XEROX/DSS to process medical expenses under the contract indicates that the average medically needy, spend-down case is currently being processed to an eligibility determination/hearing notice within the five business days contractual standard, starting on the day that the medical bills are received by XEROX. The average number of business days for processing medical bills for spend-down purposes in January, 2013, was 4.76 business days for expenses that met the client's spend-down obligation (including the time necessary for DSS to activate the case in EMS), 3.53 business days for medical expenses that were allowed for spend-down purposes but were insufficient to meet the client's spend-down obligation and establish eligibility, and 3.53 business days for expenses that were found to be unallowable, with a notice sent to the client indicating the reason why the submitted expenses were not allowed for spend-down purposes and informing the client of their hearing rights. (Exhibit 110)

    97.      In January, 2013, 140 out of 5,825 cases (or approximately 2.5% of cases) where clients submitted medical expenses for spend-down purposes were not processed within the five business day contractual standard. In other words, approximately 97.5% of spend-down cases were processed within the five business day contractual standard in January, 2013. (Exhibit 110)

    98. DSS conducted a more detailed review of the 140 spend-down cases not processed within the contractual five business day standard in January, 2013. Of that number, 115 were processed by the 10th business day, 15 were processed by the 15th business day, and 10 took more than 15

business days.  The 10 spend-down cases that were not processed by the 15th business day in January, 2013, were all processed by the 27th business day following the day of receipt by XEROX.  (Exhibit 111)

99. Plaintiffs attempt to support their claim that the defendant does not process the applications of "medically needy" individuals timely based upon consideration of incurred medical expenses by citing in their preliminary injunction brief to websites where state regulations from Ohio and Missouri can be found, which state regulations allegedly set two business day "standards of promptness," starting from the date of submission of the medial expenses.

## FACTS RELATING TO STAFFING AND VOLUME OF MEDICAID CASES

100.      DSS eligibility workers are generally assigned to processing applications and redeterminations in more than one program administered by the Defendant, e.g., both Medicaid and SNAP.

101.      In April 2011, the defendant Commissioner described the then-current service levels for  DSS programs as "woefully inadequate," in his testimony before the state legislature. (Connecticut General Assembly, Executive and Legislative Nominations Committee, Transcript of Public Hearing (April 19, 2011), page 49.

## FACTS RELATING TO VERIFICATION REQUIREMENTS/ FORM W-1348

102.      An application for Medicaid commonly requires some form of verification or additional information not included with the application.  When this occurs, Defendant is required to send out a written request for such verification or further information, using what is known as the Form 1348, on which the needed information is identified (Blank Form 1348; Connecticut Department of Social Services Uniform Policy Manual §§1540.05, P-1540.10).

27

103.     In the absence of receipt of the completed Form 1348, a Medicaid applicant will generally not know what information is missing from his or her application or even that anything is missing.

104.     Certain financial and non-financial factors must be verified in order for the Department of Social Services (hereinafter "DSS" or "the Department") to determine the eligibility of Medicaid applicants.

105.     Medicaid applicants assume responsibility for obtaining most of the verifications necessary to determine eligibility.

106.     The Department may assume responsibility for, or assist with, obtaining certain verifications on behalf of Medicaid applicants, if the applicants will have difficulty obtaining the requested information.

107.     Regardless of whether the responsibility is assumed by the Department or the applicant, verifications of certain factors are required before the Department can determine eligibility for Medicaid.

108.     Although the Department's policy does allow for other forms of verification (for example, affidavits from applicants), documentary verification is preferred and the applicant must offer a reasonable explanation why documentary verification is not available before the Department will accept other forms of verification.

109.     Verification requirements vary within different categories of Medicaid.

110.     Medicaid applicants must establish Connecticut residency.

111.     Medicaid applicants must verify identity.

112.     Medicaid applicants who are United States citizens must verify their citizenship.

113.     Medicaid applicants are not required to provide their Social Security card, but they must provide their Social Security Number.

114.     Medicaid applicants who are not United States citizens must verify their non-citizen status and where appropriate, the ability of their sponsor to provide support.

115.     Although the Department is able to independently verify identity and citizenship for most Medicaid applicants, applicants may be responsible for verifying citizenship and identity factors when the Department is unable to do so.

116.     The Department generally is unable to use earnings information received from the Connecticut Department of Labor because the information provided by that agency is approximately six months old. Current income is verified by the applicant providing current pay stubs or other documents. Note that this requirement generally does not apply to HUSKY A where self-declarations of income are generally accepted in the absence of reasons to inquire further.

117.     Individuals applying for Medicaid for the Aged, Blind and Disabled may need to verify disability if the application is based on disability.

118.     Individuals applying for Medicaid for the Aged, Blind and Disabled may need to verify their age if the application is based on the individual being elderly.

119.     Individuals applying for Medicaid for the Aged, Blind and Disabled may need to verify their marital status.

120.     Individuals applying for Medicaid for the Aged, Blind and Disabled must verify the type(s) and amount(s) of income that they and their spouses receive.

121.     Individuals applying for Medicaid for the Aged, Blind and Disabled must verify the type(s) and amount(s) of their assets that they and their spouse own.

122.      Individuals who are on a spend-down to meet Medicaid Medically Needy Income Limit must verify medical and health insurance expenses.

123.      Individuals applying for HUSKY A (Family Medical Assistance) may need to verify their relationship to household members.

124.      Individuals applying for HUSKY A (Family Medical Assistance) may need to verify who resides in their household.

125.      Individuals applying for HUSKY A (Family Medical Assistance) may need to verify whether they are pregnant.

126.      Individuals applying for HUSKY A (Family Medical Assistance) must verify any self-employment income.

127.      Individuals applying for Medicaid for Low Income Adults may need to verify their marital status.

128.      Individuals applying for Medicaid for Low Income Adults must verify the type and amount of income that they and their spouses receive.

129.      The states are mandated by federal law to verify "income" through the Income Eligibility Verification System ("IEVS"). The Income information available for the State Labor Departments, however, is frequently out of date, frequently six months old, such that the Department must require the applicant to verify income through the production of such items as pay stubs. Note that this generally does not apply to HUSKY A where self-declarations of income are generally accepted.

130.      The states are also now required by federal law to verify the citizenship, identity and Social Security Numbers of all applicants for assistance.

131.     The states at their option may require other factor of eligibility to be verified before eligibility is determined.  Connecticut has generally elected to require most factors of eligibility to be verified before eligibility can be determined, even when federal law does not specifically require that factors of eligibility to be verified.  Note that verification requirements may not apply to HUSKY A.

132.     The federal citizenship and identity verification requirements identified in Paragraph 130  are "new" in that they did not exist in 1979 when the Centers for Medicare and Medicaid Services ("CMS"), formerly called the Health Care Financing Administration ("HCFA") last re-codified the "standard of promptness" regulation.

133.     Applicants seeking Medicaid assistance for long-term care services, including applicants seeking both nursing facility care and alternative home and community-based waiver services, are subject to all of the "verification" requirements described above that apply to "HUSKY C" applicants for assistance.  In addition, as a result of amendments to the federal Medicaid statute and implementing regulations made since 1979, when the reasonable promptness regulation was last re-codified, applicants for Medicaid long-term care assistance must satisfy a number of additional eligibility requirements by producing appropriate "verifications."

134.     The new federally-mandated eligibility rules that apply to institutionalized applicants for assistance include: (a) rules requiring consideration of the income and assets of a community spouse when the institutionalized spouse applies for assistance, 42 U.S.C. 1396r-5; (b) rules requiring the states to deny eligibility if an institutionalized spouse or his community spouse transfers assets for less than fair value in the five years prior to applying for assistance, 42

U.S.C. 1396p(c); and (c) rules regarding the required treatment of self-settled trusts and annuities, 42 U.S.C. § 1396p(d) and (e).

## FACTS RELATING TO "UNUSUAL CIRCUMSTANCES" GOOD CAUSE FOR DELAY

135.    Federal regulations implementing the "reasonable promptness" requirement of 42 U.S.C. § 1396a(a)(8) provide at 42 C.F.R. § 435.911(c) that:

(c) The agency must determine eligibility within the standards except in unusual circumstances, for example –

(1) When the agency cannot reach a decision because the applicant or an examining physician delays or fails to take a required action, or

(2) When there is an administrative or other emergency beyond the agency's control.

### Implementation of Delay Reason Codes

136.    Federal regulations require the administering state agency to enter the reason for the delay in the client's eligibility file if the application is not processed within the standard of promptness. 42 C.F.R. 435.911(d).

137.    From 1992 to today, DSS never instructed its staff that it could only use excused codes if a request for information was sent out within 7 days.

138.    The Department's EMS computer system automatically sends a notice to the client at the expiration of the standard of promptness if eligibility has not yet been determined advising the client of the delay, the reason for the delay, and further advising the client of his or her right to request an administrative hearing. An example of such notice issued to plaintiff Shafer is found at Exhibit R. The reason for the delay stated on the notice depends upon the

reason code entered by the eligibility worker in the client's computerized eligibility file (or the default, unexcused, NE, "call your worker" reason code in the event no code is entered).

139.    Regional Administrator Flattery subsequently issued instructions to managers requiring them to screen the accuracy of a sample of each eligibility worker's reason codes by comparing the utilized reason code with the information contained in the client's eligibility file. Agency managers were required to report back the result of their findings to Regional Administrator Flattery. Ms. Flattery's instructions and agency manager's findings as to the accuracy of reason codes is stated in Exhibit 121.

140.    On March 14, 2013, the Commissioner issued an amended directive, Exhibit W, amending his prior directive by requiring the initial request for verification to have been issued within twenty days of the date of application in order for "unusual circumstances" to be found and an "excused" reason code to be utilized. Exhibit 123

141.    As a result of this new 15-day allowance under the Commissioner's memoranda, workers may code any delay in the processing of an application as "excused" (i.e. "unusual circumstances") if documentation is submitted more than 30 days after the application is filed, as long as the Form 1348 was mailed out within 20 days of submission of the application.

142.    The necessary EMS changes will be made to allow for the use of the new reason codes, effective April 1. Exhibit 124.

143.    A mandatory staff training curriculum has been prepared regarding the proper use of the new training codes. Eligibility staff, supervisors and operation managers will be required to complete the training program by April 1. The training curriculum specifically includes training on the requirement that verifications must have been requested within twenty days of the date of application in order for an excused reason code to be utilized. Exhibit 125

144.    Directions have been issued to supervisors and managers requiring them to review and report on a random sample of delay reason codes for the months of April, May, and June, 2013.  Depending on their findings, the supervisory review period may be extended.  Exhibit 126