## PLAINTIFFS PROPOSED FACTUAL FINDINGS – CONTESTED

## FACTS RELATING TO THE NAMED PLAINTIFFS AND INTERVENORS

Joshua Harder

1. For the six-month period, from July 1, 2011 to December 31, 2011, Plaintiff Harder had a spend-down amount of $214.68. On October 14, 2011, Marguerite Madden (NOW Marguerite Gentile) submitted $218.39 in medical expenses to his DSS worker, along with a note explaining what the bills were for. Ms. Gentile brought in bills to the DSS New Haven office on October 14, 2011 and put them in the slotted internal drop box, located in the office reception area. (Testimony of Ms. Harder, Ms. Gentile; Exhibit 2)

2. After this case was initiated, with Mr. Harder as a named plaintiff, DSS could not find the medical bills submitted by or on behalf of Mr. Harder in October 2011 by Ms. Gentile. Specifically, the Department's records did not disclose any medical bills similar to the bills that were eventually submitted by Ms. Gentile in January 2012, at the specific request of the Department after the lawsuit had been filed. (Jt. findings of fact 12)

3. Losing paperwork submitted by applicants, including spend-down applications is an ongoing problem in the regional offices. (Exhibits 39-40; Testimony of Velardi, McKeon)

Intervenor Mouanodji Mbaissouroum

4. The Department of Social Services granted Mr. Mbaissouroum's application for HUSKY A for himself and his family more than 45 days after the date he applied based on documents he supplied with his application on November 7, 2011. (Exhibit 41)

Proposed Intervenor Robert Davis



5. Robert Davis, Jr. is 87 years old and resides with his spouse and daughter at 14 Stockings Brook Rd., Kensington, Connecticut, 06037. His total income is $1,706.20 per month, which is from Social Security Retirement. His assets total less than $1,600. (Testimony of Leann Blakely)

6. He has filed a motion to intervene in this case. (Doc. 111)

7. Mr. Davis's Medicaid Waiver Home Care Application was mailed to the Department of Social Services ("DSS") on September 25, 2012. Also on that day a fax was sent to the Alternate Care Unit to request a home health screen related to this application. Mr. Davis had already been found functionally eligible for the Connecticut Home Care Program for Elders. (Testimony of Leann Blakely)

8. Mr. Davis heard nothing from DSS until November 2012. According to DSS's documents, a W-1348 verification notice was not mailed until November 11, 2012 because that is the date on the notice. However, November 11 was a Sunday, and the next day, November 12, was officially Veterans' Day, a legal holiday. Therefore, the letter was most likely not mailed to Mr. Davis until at least November 13, 2012, 49 days after Mr. Davis' application was sent to DSS. (Exhibit 33)

9. Mr. Davis heard nothing more from DSS until January 29, 2013, when DSS worker Jose Espejo called Mr. Davis's lawyer's office and stated he (the DSS worker) had a lot of cases and had not yet reviewed Mr. Davis's case. Thereafter, there have been more delays and more requests for additional information, which Mr. Davis dutifully provided. (Testimony of Leann Blakely)

10. It has now been more than six months since Mr. Davis applied for Medicaid services and he is in desperate need of medical and home care benefits. He has not received any

indication of when DSS will make a decision. Meanwhile, Mr. Davis's spouse and daughter continue to care for him at home. (Testimony of Leann Blakely)

11. As of March 20, 2013, the date of Mr. Davis' Motion to Intervene and 156 days after he submitted his application, his Medicaid application had not been decided by DSS. (Testimony of Leann Blakely)

## FACTS RELATING TO OVERDUE PENDING APPLICATIONS

12. The *Alvarez* stipulations are a series of three court-approved stipulations between Wilma Alvarez and the Department of Social Services entered over twenty years ago in a case called *Alvarez v. Commissioner, Department of Income Maintenance*, No. B-90-190(WWE). (Exhibits 7-9)

13. The *Alvarez* stipulations are binding on the defendant Commissioner; however, because *Alvarez v. Commissioner, Department of Income Maintenance* was never certified as a class action, their provisions are only enforceable by Wilma Alvarez, the named plaintiff. Nevertheless, their provisions, and the Department's implementation of them over the course of the last twenty years – during which time DSS understood the stipulations to be fully binding (Testimony of Marc Shok)-- are instructive for the measurement of compliance for the timely processing of Medicaid applications (the overdue pending report, referred to herein as the Alvarez/Intake Report), the requirements for the timely issuance of verification notifications, and the standards for coding overdue Medicaid applications as "unusual circumstances."

14. Under the *Alvarez* stipulations, the Department determined compliance with the federal Medicaid timeliness requirements by measuring the percentage of overdue pending applications at the end of each month against the total overdue pending applications. (Exhibits 7-9, see also Exhibits 16-17)

15. Under the *Alvarez* stipulations, the Department agreed to a goal of having no more than 5% of all applications pending statewide at the end of each month untimely (i.e. beyond the federally mandated timeframe), absent unusual circumstances as defined in the *Alvarez* stipulations. Similarly the Department agreed to a goal that no more than 10% of the pending applications in any regional office would be untimely absent unusual circumstances as defined in the *Alvarez* stipulations. (Exhibits 7-9).

16. For the last twenty years, the Department has reported on the percentage of overdue pending applications in an Intake Report that is issued on approximately the 10th day of the following month. The numbers and percentages of overdue applications are reported by regional office and as statewide totals. (Joint Findings of Fact; Exhibit 7-9, 16-17)

17. Under the *Alvarez* stipulations, the Department also agreed that a request for verification (currently referred to as the "Form 1348 notice") is required to be mailed to an applicant within seven (7) days of the receipt of an application for any benefit program including Medicaid (Exhibit 8, at 7, 10).

18. Under the *Alvarez* stipulations, the Department also agreed that documents submitted by the applicant in response to a verification notice must be reviewed by Department employees within 7 days. (Exhibits 7-9)

19. The *Alvarez* stipulations (Exhibits 7-9) recognize that the issuance of a timely verification notice and timely review of documents are both essential to enable the Department to process an application within the required time frame, generally 45 days, for processing a Medicaid application.

20.     Although not certified as a class action, *Alvarez* was recognized for twenty years by DSS as binding under the terms of its settlement with Ms. Alvarez. The Department understood that it was required to comply with its terms. (Testimony of Marc Shok).

21.     Based on the Department's monthly *Alvarez*/Intake Report, it is clear that the Department is not in compliance with federal Medicaid law, either for its regional offices or statewide. (Exhibits 16-17) *See* Joint Findings of Fact (hereinafter, "Jt. Findings") 22, 52-60

22.     Defendant's recent improvements in reducing the number of overdue pending application does not defeat his liability for violation of 42 U.S.C. § 1396a(a)(8), particularly given the vast disparities among regional offices and among Medicaid programs.

## FACTS RELATING TO THE APPLICATION LENGTH PENDING (DISPOSITION) REPORT

23.     Although the Department's Application Length Pending disposition figures include dispositions of applications that were subject to the 90 day timeline, the percentage of applications submitted to the Department monthly that are based on disability (and thus subject to 90 days) is only about 2% of the total (Exhibits 16-19). Accordingly, the Department's numbers for applications granted or denied is a reliable source of proof of the Department's noncompliance with the requirements of federal Medicaid law.

24.     The parties have agreed to certain figures drawn from these reports for the months of June 2011, February, 2012, May, 2012, August 2012, November, 2012, and February 2013 (Jt. Finding 69).

25.     Based on these agreed-upon figures, in February 2012, DSS collectively granted or denied 17,389 applications. Of that number, 5,337 applications were granted or denied 46 days or more after the date the application was submitted, representing 31% of the total granted or denied in that month. Jt. Findings 70

26.     Based on these agreed-upon figures, in May 2012, DSS collectively granted or denied 17,109 applications. Of that number, 4,993 applications were granted or denied 46 days or more after the date the application was submitted, representing 29% of the total granted or denied in that month. Jt. Finding 71.

27.     Based on these agreed-upon figures, in August 2012, DSS collectively granted or denied 23,388 applications. Of that number, 7,246 applications were granted or denied 46 days or more after the date the application was submitted, representing 31% of the total granted or denied in that month. Jt. Finding 72

28.     Based on these agreed-upon figures, in November 2012, DSS granted or denied 22,932 applications. Of that number, 7,249 applications were collectively granted or denied 46 days or more after the date the application was submitted, representing 31.61 % of the total granted or denied in that month. (Jt. Finding 73).

29.     Based on these agreed-upon figures, in February 2013, DSS collectively granted or denied 18,406 applications. Of that number, 4,027 applications were granted or denied 46 days or more after the date the application was submitted, representing 22% of the total granted or denied in that month. (Jt. Finding 74).

30.     Based on these agreed-upon figures, in February 2013, there were 89 more applications granted or denied 46 days or more after the application was initially filed than in June, 2011. (Jt. Finding 69-74)

31.     The Department's Application Length Pending disposition figures also clearly demonstrate that the Department is not in compliance with the federal Medicaid law. (Jt. Finding 64, 69-74)

32.     Defendant's recent improvements in reducing the numbers of dispositions of Medicaid applications made beyond the standard of promptness does not defeat his liability for violation of 42 USC 1396a(a)(8).

**FACTS RELATING TO MEDICAID APPLICATION TIMELINESS REPORT**

33.     After the commencement of this litigation, in November, 2012, the Department undertook an effort to produce a new set of data from its EMS system specifically "to address litigation issues." (Exhibits 24, 25, 26, 31).

34.     This new ad hoc EMS report (Medicaid Timeliness Report) shows how many of the applications filed within a given calendar month between July 2011 and November 2012 (the most recent month for which data is available) were processed within the applicable federal time frame. The Department reviewed applications for each of its major Medicaid programs (HUSKY A, C, and D) and broke the data down by regional offices. (Exhibit 23, 27). In February 2013, the Department released a Medicaid Application Timeliness Report which is a summary of the total data collected (Exhibit 22).

35.     The timeliness of monthly application processing varies, depending on the specific Medicaid program for which the application is made. Defendant's timeliness rate for the monthly processing of Medicaid HUSKY A and C applications (excluding applications for the Husky C Long Term Care program) worsened between July 2011 and November 2012 according to the new report. (Exhibit 23). Jt. Finding 87.

36.     In particular, the Department's timeliness rate for HUSKY D (LIA) applications – applications filed by single individuals, like Plaintiff Paul Shafer, with incomes that are only 55% of the Federal Poverty Level (for most parts of the State) worsened by 7.55% during this four month period. (Exhibit 27). *See also* Jt. Finding 87.

7

37. The timeliness rate for processing Medicaid applications also varies widely, depending on which of the 12 regional offices is processing the application. Between June and September, 2012, the Department had a statewide average monthly timeliness rate for the processing of HUSKY D applications of 71.32%, meaning that an average of 71% of all applications filed during one of those four months was timely processed. (Exhibit 27).

38. No less than 6 of the 12 regional offices had a timeliness processing rate of less than this average. The timeliness rate for the processing of HUSKY D applications between June and September 2012 ranged from only 26% for the Danbury office to 83% for the Hartford office. In between, the Stamford office had a timeliness rate of 50% for the processing of HUSKY D applications and the New Haven office had a timeliness rate of 62% for processing HUSKY D applications (Exhibit 27).

39. Several regional offices showed *worsening* timeliness rates for the processing of HUSKY D applications during this four month time period. For example in June 2012, the New Britain regional office had a timeliness processing rate of 79%, meaning that it processed 79% of the HUSKY D applications filed in June 2012 within the federal time frames. By September, that timeliness rate was 68% (Exhibit 27).

40. Significantly, the Department no longer reports separate data for the timely processing of HUSKY D LIA applications, although it does report separate timeliness data for the LTC program. Jt. Finding 87.

41. Based on the above numbers from Department's monthly Medicaid Timeliness Report, it is clear that the Department is not in compliance with federal Medicaid law, for any of its regional offices, for any of its Medicaid programs, and it is not in compliance on a statewide basis. (Exhibits 22-23, 27) (Jt. Finding 87, 92).

42. Defendant's recent improvements in reducing the number of untimely processed Medicaid applications does not defeat his liability for violation of 42 U.S.C. § 1396a(a)(8), particularly given the vast disparities among regional offices and the vast disparities among Medicaid programs, particularly HUSKY D (LIA) and Long Term Care.

**FACTS RELATING TO VERIFICATION REQUEST DELAYS**

43. Although it implemented many other parts of the *Alvarez* stipulation, DSS never implemented the particular part of the *Alvarez* stipulations requiring verification requests (Form 1348s, *see* Exhibit 12) to be issued in seven days of filing of an application. It is nowhere found in the Department's Uniform Policy Manual, the codification of regulations applicable to the Department. (Testimony of Shok).

44. DSS has no regulations requiring that the Form 1348 be sent out within any specific timeframe. (Testimony of Shok).

45. Defendant also never instructed its eligibility employees about the need to issue this request for information within a timely manner. (Testimony of Shok).

46. Form 1348s are routinely issued by DSS eligibility workers more than 10 days after the date an application for Medicaid is received. (Testimony of Ober, Velardi, McKeon)

47. Most are issued more than 20 days after the date the application is received. (Testimony of Ober, Velardi, McKeon)

48. Indeed, it is possible for a Form 1348 to be issued after the 45 day period for processing the application. (Testimony of Marc Shok, testimony of Leann Blakely, Exhibit 33)

49.  When a Form 1348 is not sent to an applicant within *at least* 7 days of the date of the application, it is very likely that the application will not be processed within the mandated time period, which is 45 days in the vast majority of case. This is because:

- most verification requests are sent by United States postal service mail so applicants do not receive the Forms 1348 for at least 2-3 days (Testimony of Shok);

- applicants must be afforded at least ten days to provide the requested documents (Exhibits 34-37);

- workers require at least several days to review the documents provided before acting on them (Exhibit 21);

- Sometimes the need for additional information is revealed by the initial information provided in response to the initial Form 1348. This is particularly true for applicants for the Long Term Care Program where two Form 1348 requests are routine (Testimony of Shok)

## **FACTS RELATING TO INCREASING WORKLOADS AND WORKER SHORTAGE**

50.  Between July 2011 and October 2012, the defendant Commissioner received an average of 24,500 applications for Medicaid each month (Exhibits 22, 23), compared to an average of about 13,000 total applications per month in 2002 (Exhibit 4, at pages 29, 32, 35 and 38), an increase of about 88%.

51.  Between July of 2002 and March of 2012, the number of DSS employees involved in eligibility determinations for all programs dropped by about 30%, from 845 to 586, before further reductions in October 2011 due to early retirements. (Exhibit 4, at page 63; Exhibit 5, at page 11).

10

52.     With the hiring of about 220 eligibility workers in two groups in 2012, the total number of eligibility staff returned to about 881 employees. (Exhibit 6). This is about 4% more eligibility staff than Defendant had in July of 2002 (845)-- before the Medicaid enrollment caseload increased by about 77% and the Medicaid application caseload increased by about 88% (from about 13,000 to about 24,500 total applications per month).

## FACTS RELATING TO "EXCUSED DELAYS"

53.     Under the *Alvarez* stipulations, when a request for information was not sent to an applicant in a timely manner, i.e. within at least 7 days of the date of application, DSS could not claim that its failure to process the application in a timely manner was "excused," i.e., attributable to "unusual circumstances." (Exhibit 8, at page 7), because it did not act in a timely manner to even begin the eligibility determination process.

54. T       his requirement in the *Alvarez* Stipulations was never implemented. (Shok Testimony)

55.     Notwithstanding the requirements of the *Alvarez* stipulations, prior to at least April 1, 2013, DSS eligibility workers routinely designated delayed applications as "excused," i.e. attributable to "unusual circumstances," without regard to whether, or when, the applicant was sent a Form 1348. (Testimony of Ober)

56.     As recently as February 2013, DSS workers coded 70% of its overdue pending Medicaid applications (2,393 applications) as "excused" (i.e. delayed by "unusual circumstances") regardless of when – or whether – a Form 1348 was issued (Exhibit 17).

57.     The Department's coding system of excused vs. unexcused delays has for years been unreliable, as measured against the requirements of the *Alvarez* stipulations, because the central *Alvarez* requirement that a request for verification be sent out within seven days of the

11

application date as a condition for using excused codes was never implemented. (Testimony of Shok)

58.  The Department's coding system of excused vs. unexcused delays is unreliable today as measured against the requirements of the *Alvarez* stipulations. (Testimony of Shok).

59.  Accordingly, the defendant has not met his burden of demonstrating that any overdue application pending at the end of a month referenced in the *Alvarez* Intake report (Jt. Finding 52) was attributable to "unusual circumstances," including applicant fault.

60.  On March 11, 2013, the defendant Commissioner issued a memorandum in which he streamlined the codes for so-called "excused delays." (Exhibit 20).

61.  Under his new policy, as revised on March 13, 2013, workers are allowed to excuse any delay in the timely processing of applications, i.e., classify such delay as an "unusual circumstance," as long as the worker sent the applicant an initial verification notice not later than 20 days after the date of the application. (Exhibits 20, 21).

62.  There is no time requirement in the Commissioner's memoranda for sending out third party requests for information although applicants sometimes require assistance with seeking verifications. (Exhibits 20, 21).

63.  Although the *Alvarez* stipulations require that verification notifications be sent out within 7 days, the defendant Commissioner has never sent out any instructions to workers requiring issuance of the Form 1348 in *any* particular period of time. (Shok Testimony). However, as of March 13, 2013, the Department maintains that, in light of the current volume of applications and cases and its limited resources, it is reasonable to allow workers up to *twenty* days to send out the verification request form (Exhibit 21).

64. Similarly, although the *Alvarez* stipulations required DSS to review all documentation submitted by applicants within 7 days, DSS now maintains that, in light of its current volume of applications and limited resources, it is reasonable to allow eligibility workers up to *fifteen* days to review any documents provided. (Exhibits 20, 21)

65. As a result of this new 15-day allowance under the Commissioner's memoranda, workers may code any delay in the processing of an application as "excused" (i.e. "unusual circumstances") if documentation is submitted more than 30 days after the application is filed (i.e., less than 15 days prior to the end of the 45-day standard of promptness), as long as the Form 1348 was mailed out no later than 20 days after submission of the application, and likely received by the applicant 22 or 23 days after the date of the application. (Exhibit 21).

66. The Commissioner's failure to require the timely issuance of verification notices, i.e., within 7 days, by allowing eligibility workers up to 20 days to even touch an application, will not only result in the untimely processing of many more applications but also, under his new March, 2013 memoranda, he has ensured that most of the resulting untimely processed Medicaid applications can be coded as "excused" (i.e. attributable to "unusual circumstances"). (Exhibit 21). For example:

- Under these new policies, if a verification form is mailed to the applicant on the 20th day after he or she submitted his or her application, and the applicant receives that Form 1348 notice on the 23rd day, and he or she returns the documents requested by the 31st day (8 days from receipt of the Form 1348), any further delay by the DSS worker – whether it be a decision on the 46th day or the 100th day after submission of the application – is classified by the Commissioner's memoranda as "excused," i.e. an

13

"unusual circumstance" because the worker did not have 15 days ("sufficient time") to review the documentation provided.

- Under these new policies, if the Department sends out a Form 1348 on the 20th day after the application is filed, and the applicant asks for assistance in obtaining the necessary verification on the 22nd day after he or she filed the application immediately upon receiving the 1348, and the Department does not make this third party request until 45 days after the application was filed, that delay is considered "excused," i.e. "unusual circumstances," because there is no time requirement in the Commissioner's memoranda for sending out third party requests for information.

67.     Based on the Department's historic (and, until recently, secret) non-compliance with the *Alvarez* stipulations, its failure to ensure the timely issuance of verification notices, and its planned failure to ensure the timely issuance of verification notices or the timely review of resulting submissions in the future – coupled with its historic failure to properly maintain and process documentation provided by applicants and their providers -- the Department may not rely on excused codes to show "unusual circumstances" for its non-compliance with federal Medicaid law.

## FACTS RELATING TO SPEND DOWN REQUIREMENTS

68.     Defendant has no regulation establishing a standard for timeliness for the processing of medical expenses submitted by members of the spend-down applicant class to determine if a member of this class has met his or her spend-down obligation for the current six month period which would then entitle the spend-down applicant to receive Medicaid payment for all future Medicaid-covered services provided during the remainder of the six month period.

69. Indeed, DSS maintains that the standard of promptness for processing medical expenses submitted by members of the Spend Down class is 30 days. (Def. Exhibit 101) Further, DSS has complained to plaintiffs' counsel about the cost of the contract with XEROX and has suggested that it will not be renewed for "resource" reasons. (Exhibit 15).

70. Many of the spend-down determinations are not referred to XEROX and are made entirely by the same overworked staff unable to keep up with basic Medicaid processing. (Testimony of Shok). Without a regulation defining the standard of promptness as a reasonable 5 business day period (3 for emergency), defendant is free to either terminate or change the terms of its agreement with the private party currently reviewing such medical expenses, enabling both DSS and the contractor to allow far greater time to review such expenses and provide such coverage. (Exhibit 15).