# DEFENDANT'S PROPOSED FINDINGS OF FACT

## Processing of Medicaid Applications

1. Verifications requested by the Department from third-party sources such as employers and financial institutions may result in application processing delays. Testimony of Shok.

2. When an individual has not been determined to be disabled by the Social Security Administration, the Department must make its own disability determination. Disability is determined based on information supplied by third parties, such as doctors, concerning the individual's health condition and impairments. Third party delay in submitting documentation or in submitting inadequate documentation often requires the Department to make additional requests or request additional information concerning the individual's disabilities. Testimony of Shok.

3. Individuals applying for payment of Medicaid long term care services (e.g., nursing home and Medicaid waiver) must provide verification of their income and assets for themselves and for their spouse during the previous 60 month period. Testimony of Shok.

4. Plaintiffs' Complaint erroneously asserts that the only eligibility factor that requires verification for Medicaid HUSKY "A" and "D" applicants is income, which allegedly can be readily verified. In fact, all applicants for Medicaid, including applicants for Medicaid "A" and "D," are required to verify proof of citizenship, identity, and provide Social Security Numbers as a result of the requirements of federal law. In addition, all applicants for Medicaid "A" must verify their relationship to an assisted dependent child when questionable or verify pregnancy. Furthermore, as previously noted, verification of "income" cannot readily be obtained through the IEVS system. Testimony of Shok.

## Special Problems Determining Eligibility for Long-Term Care Applicants

5. Determining eligibility timely for Medicaid applicants seeking coverage for long terms care services has become especially problematic in recent years as a result of a series of federal statutory amendments imposing new verification requirements, and as a result of federal statutory amendments tightening up eligibility requirements for institutionalized applicants in a manner designed to ensure that only the truly needy receive taxpayer-funded Medicaid benefits. An "industry" of Medicaid-planning attorneys has arisen that advises clients on techniques to be employed in attempts to obtain eligibility, while preserving funds for family members and shifting the cost of long term care to the taxpayers. Testimony of Shok.



6. These new federally-mandated eligibility rules that apply to applicants for long-term care assistance are extremely difficult and time-consuming to administer. For example, the current federal transfer of assets rules, as a practical matter, often require states to obtain five years of financial records from the applicant (and the applicant's spouse if s/he is married). The Department must then examine the records and identify potential transfers made for less than fair value. The Department must then ask the applicant to address the questionable transfers, demonstrating either that fair value was received in return or that the transfer is not otherwise subject to a penalty. Frequently, delay occurs at each stage of the process, with the client needing more time to assemble the financial records, the Department needing time to review the records and to identify possible improper transfers, and with the applicant needing more time to explain and to "verify" what was received in return. Testimony of Shok.

7. Similarly, long-term care cases involving spousal assessments under 42 U.S.C. § 1396r-5, self-settled trusts, single premium annuities, and "spousal refusal" require careful investigation of the facts. The Department frequently requires legal assistance before it can make an eligibility decision, for example, a legal interpretation of the terms of a self-settled trust. Cases involving long terms care applicants are commonly contested before a Department hearing officer and, at times, in court. Testimony of Shok.

8. As a result of the new verification requirements, and as a result of the new federal statutory eligibility requirements that apply to applicants for long term care assistance, it is very difficult to determine eligibility in many such cases involving long-term care applicants within the applicable standard of promptness as a result of the need to obtain additional information from the applicant, and the need to evaluate the information, frequently with the need for legal assistance. Testimony of Shok.

9. The number of long term care applicants is "small" in comparison to the number of individuals residing in the community who seek Medicaid assistance; however, because of the complexity in making such determinations, long term care applicants make up a disproportionate share of all applications that are considered "delayed," beyond the standard of promptness. It is not uncommon for a long-term care application to remain pending for many months. A single long-term care application, therefore, could be represented as a "delayed" case in repeated Alvarez monthly reports. Testimony of Shok.

## Processing of Medically Needy Cases

10. DSS has adopted regulations that are contained in its Uniform Policy Manual governing the standards of promptness to make changes in eligibility status as a result of "Interim Activity." "Interim Activity" is defined in policy as relating to changes that occur between the time of application and redetermination. The submission of medical bills in order to qualify as "Medically Needy" constitutes a form of Interim Activity. UPM 1555.30 B.2., Exhibit 101 provides that the Department will make changes in eligibility status related to Interim Activity within a reasonable time, not to exceed thirty days. Testimony of Shok.

11. It is, in fact, the policy and practice of DSS to issue a notice to the applicant when DSS reviews submitted bills and determines the bills to be sufficient or insufficient to establish eligibility a medically needy. The notices that are issued by the Department or by XEROX, a DSS contractor, acting on behalf of the Department, advise the applicant of his or her right to request an administrative "fair hearing." Testimony of Shok.

12. Joshua Harder claims that one Marguerite Madden submitted copies of medical expenses on his behalf to DSS in October, 2011. Plaintiff Harder has no first-hand knowledge of whether Ms. Madden submitted copies of medical expenses on his behalf, or not. Testimony of Robinson-Patton.

13. As part of the ordinary course of business, the Department maintains copies of medical expenses that are submitted to establish eligibility as medically needy. Testimony of Robinson-Patton.

14. The claim that Ms. Gentile physically delivered the medical bills to the DSS and dropped them in the drop box is not consistent with the usual and customary practice of medical providers who generally FAX medical bills to the Department on behalf of their patients, to the extent that they undertake to provide this service on behalf of their patients. Testimony of Robinson-Patton.

15. The process of determining whether an individual is eligible for Medicaid assistance as medically needed based upon incurred medical and remedial expenses (or the "spend-down process," as it is commonly called) is one of the most complex and time-consuming eligibility-related tasks. Testimony of Shok.

16. Based on experience with difficult cases, it can reasonably be expected that (after all other eligibility factors are determined), such spend-downs can be processed within thirty days, the standard of promptness allowed for "Interim Changes." Testimony of Shok.

17. The Ohio and Missouri regulations are inconsistent with plaintiffs' characterizations in that the text of the regulations that set time deadlines for the state agency to act on submitted medical bills for purposes of determining eligibility as medically needy do not start to run until the agency has gathered all pertinent information necessary to determine if the submitted bills qualify for spend-down purposes. Specifically, the Ohio regulation states a number of verification requirements that must be established in order for the agency to determine whether the submitted medical expenses qualify for spend down, and then provides that the agency shall authorize coverage of additional medical expenses "within two business days after the SAG submits verification showing that incurred medical expenses for the month satisfy the SAG's spend down amount for the month." Ohio regulation 5101:1-39-10(H)(7)(C) (page 25 of regulation); Exhibit 112. Similarly, the text of the Missouri regulation provides the Missouri worker should "enter the incurred medical expenses ... within two working days of receipt of documentation of medical expenses that meet spend down once the amount the third-party payment and personal responsibility has been documented." Missouri regulation 0810.010.15.10; Exhibit 113. The regulatory processing

periods adopted by those states do <u>not</u> start to run on the date of initial submission of medical bills to the state agency, but, instead only start to run when all verification necessary to determine eligibility have been submitted.

18. States have the option of employing one-month or up to a six-month spend-down period. The time it reasonably takes for a state with a one-month spend-down period to process medical expenses for spend-down purposes can't realistically be compared to the time it reasonably takes a state with a six-month spend-down period because typically much greater amounts of medical expenses must be submitted in states with six-month spend-down periods in order to reduce six months of excess income. Clients frequently save up documentation of medical expenses and submit them all at once when they believe that they have satisfied their six-month spend-down obligation, making it more time consuming for the agency to process the additional submitted expenses (in comparison to only processing expenses sufficient to satisfy a one-month spend-down obligation).

### "Unusual Circumstances" – Good Cause for Delay

19. That following the <u>Alvarez</u> stipulations, which plaintiffs acknowledge "are not binding" and are "legally irrelevant," the Department promulgated regulations, maintained in Uniform Policy Manual formal pursuant to Conn. Gen. Stat. § 17b-10, which implement the unusual circumstances, good cause exception of 42 C.F.R. § 435.911(c) by indicating that the Department is not required to process a Medicaid application within the standard of promptness when the client has good cause for not submitting verifications by the deadline, the client has been granted a ten-day extension to submit verifications which has not elapsed, and the Department has assumed responsibility for obtaining verification and has either had less than ten days or is awaiting material from a third party. UPM 1505.35 D, Exhibit 114; testimony of Shok.

20. Another <u>Alvarez</u> "good cause" stipulation excusing delays is implemented in state regulation at UPM 1505.40. B.4 which excuses delay in determining eligibility when the delay is attributable to "unusual circumstance beyond the applicant's control" such as applicant sickness which prevents her from producing the necessary verifications. UPM 1505.40 B4, Exhibit 115; testimony of Shok.

### Impact of Alvarez Stipulations

21. The plaintiffs agree that, the <u>Alvarez</u> stipulations "are not binding ... because <u>Alvarez</u> was never certified as a class action. (Def's PI Mem. at 12)." Plaintiffs' April 27, 2012 Reply Brief in Support of Preliminary Injunction at p. 6, Exhibit 116. Plaintiffs further acknowledge therein that "the <u>Alvarez</u> stipulations are not legally relevant." <u>Id.</u>, Exhibit 116.

### Implementation of Delay Reason Codes

4

22. In April, 2004, Kevin Loveland, former Director of Assistance Programs, DSS, issued instructions reminding staff that, "It is imperative that steps be taken to ensure that all pending cases are coded appropriately." Exhibit 117. Attached to the memo was a list of thirteen reason codes, excused and unexcused, that staff were expected to utilize in recording reasons for delay at the expiration of the standard of promptness. Where no reason code is entered by the eligibility worker, it is automatically recorded by the Department's EMS system as "NE," which is an unexcused reason code and instructs the client to call his or her eligibility worker. Testimony of Shok.

23. Plaintiffs claim in this case that Department workers frequently misrepresents the reason for the delay by erroneously entering "excused" reason codes when the reason should properly be coded as "unexcused," based on the instructions issued by Mr. Loveland in April, 2004. Plaintiffs further claim that erroneous reason codes are entered in an effort to misrepresent the extent of the agency delay, by over-reporting "excused" reason codes. See Complaint, ¶¶ 21 (general allegation), 50-52 (alleging that the reason stated on the notice sent to plaintiff Shafer erroneously represented that requested information had not been provided – an excused reason code – when, in fact, all requested information had allegedly been provided).

24. The Department responded to the allegations in plaintiffs' Complaint on February 9, 2012, when Commissioner Bremby issued a memo to agency managers and eligibility staff. That memo advised in part that, "it is critical that the information obtained from EMS be as accurate as possible," and that, "it is essential that staff … enter the appropriate reason codes as an application approaches the standard of promptness." The Commissioner attached to the memo a listing of the thirteen overdue reason codes, including both excused and unexcused reason codes identified in Mr. Loveland's memo of April, 2004. Exhibit 119; testimony of Ferron-Poole.

25. On February 9, 2012, Regional Administrator Silvana Flattery also sent a memo to all agency operations managers reiterating the Commissioner's directives about the importance of entering correct reason codes. Said memo further instructed agency managers that workers should enter the Worker Delay reason code if the reason for the delay is attributable to the worker, and directed agency managers to provide instructions to eligibility staff on the need to enter correct reason codes. Exhibit 120; testimony of Ferron-Poole.

26. In response to ongoing concerns raised by plaintiffs that the thirteen reason codes identified in the Kevin Loveland memo of April, 2004, are allegedly over-lapping and unclear such that they were allegedly not being applied consistently, the Commissioner issued a directive to Social Services Operations Managers and Eligibility Staff dated March 11, 2013, directing that effective April 1, 2013, six new "reason codes" (five excused, one unexcused) would replace the former thirteen codes. Exhibit 122; testimony of Shok.

   The new "excused" reason codes are:

   EX (Extension Granted), which applies when an applicant has requested an extension of time to produce verifications, which request has been granted by the Department;

5

      TD (Third Party Delay), which applies when the applicant has requested the Department's assistance in obtaining a verification and the Department has not yet received the verification;

      IT (Insufficient Time) which applies when the Department receives requested verifications but has not had fifteen days to evaluate whether the produced verifications are sufficient to establish eligibility;

      MV (More Verification), which applies when the Department has requested and received verification within the standard of promptness but determines that additional verification is required and issue a follow-up request for additional verifications. Exhibit ___, testimony of Shok; and

      EE (Emergency Event), which code may only be utilized upon the approval of the DSS Central Office as a result of an administrative or other emergency beyond the Department's control.

    Exhibit 122, testimony of Shok.

27. Except for the ET code, the directions issued by the Commissioner on March 11, 2013, regarding the excused delay reason codes did not explicitly require that DSS must have issued a request for verifications (or "W-1348") by a date certain in order for the excused reason code to be employed; however, by implication, the W-1348 must have been sent out by no later than day 35 in order for the excused reason codes to be applicable to a Medicaid application with a 45-day processing time standard because agency policy requires the applicant to be afforded at least ten days to produce verifications, request extra time, or request assistance from the Department in obtaining verification. Exhibit 122, testimony of Shok.

28. The purpose of the new reason codes is to ensure consistency with the meaning of "unusual circumstances" under federal law as a valid reason for not processing applications timely, while promoting uniformity and consistency of application of the revised reason codes. Testimony of Shok.

29. As long as the applicant is afforded an opportunity to have eligibility adjudicated within the standard of promptness, an arbitrary limit on the Department's ability to legitimately classify delayed applications as excused by "unusual circumstance" attributable to client or third-party delay, such as the seven-day limitation proposed by plaintiffs, is not reasonable. There is no federal law requiring state Medicaid agencies to requests verifications by any date certain. Plaintiffs' proposed seven-day limitation does not reflect the realities of limited resources or the administrative obligations on the Department. It would also require applications that have been processed by the Department in a manner that afforded applicants with the opportunity to establish eligibility within the standard of promptness to be classified as "unexcused," notwithstanding that the delay in determining eligibility is properly attributable to applicant or third-party delay in producing the requested verifications.

Testimony of Shok.

30. Supervisors are required to determine whether the delay reason codes entered are consistent with agency directives, based upon client application information maintained in the EMS eligibility file, including the requirement that initial verifications must have been requested within 20 days of the date of application in order for an excused delay code to be used. Testimony of Hearn.

31. Supervisors will report their findings to agency operations managers and to Mr. Patrick Hearn in DSS Central Office on a prescribed supervisory review form. Exhibit 126. Mr. Hearn will review the supervisory review forms and determine whether, based on the information provided, eligibility workers are properly employing the delay reason codes in accordance with agency policy. Testimony of Hearn.

## Application Reporting Systems

32. The Intake Report shows the percentage of pending applications that are delayed for reasons considered "unexcused" based on the codes developed in response to the *Alvarez* settlement and clarified in the Kevin Loveland memo of 2004. Testimony of Shok; Exhibits 127-152.

33. The Intake Report shows the percentage of overdue pending Medicaid applications that are the result of "unexcused" delays based on the number of unexcused delay codes that are entered by DSS in the month. Testimony of Shok; Exhibits 127-152.

34. The application totals in the Intake Report do not include any Medicaid applications that DSS actually processes within a month. Testimony of Shok; Exhibits 127-152; Exhibit 153.

35. The chart below shows the number of Medicaid applications pending at the end of month, the number of overdue pending Medicaid applications, the number of Medicaid applications pending at month's end that are overdue for excused delays, the percentage of the total pending Medicaid applications that are overdue, and the percentage of all overdue pending Medicaid applications that are overdue because of "unexcused" delay drawn from the Intake Reports from January 2011 through February 2013:

| Month/Year | Medicaid applications pending at month end | Medicaid applications pending at month end that are "overdue" (not yet completely processed but | Medicaid applications pending at month end that are overdue for "excused" delay | % of total pending Medicaid applications at month end that are overdue out of the total pending | % of pending Medicaid applications that are overdue because of "unexcused" delay |
|---|---|---|---|---|---|

|  |  | beyond the time standard |  | Medicaid applications at month end |  |
|---|---|---|---|---|---|
| Jan 2011 | 10,100 | 4,823 | 4,300 | 48 % | 5% |
| Feb 2011 | 10,634 | 4,839 | 4,246 | 45.5% | 6% |
| Mar 2011 | 10,968 | 4,682 | 4,155 | 43% | 5% |
| Apr 2011 | 11,126 | 4,845 | 4,374 | 43.5% | 4% |
| May 2011 | 10,616 | 4,599 | 4,208 | 43% | 4% |
| Jun 2011 | 10,628 | 4,956 | 4,460 | 47% | 5% |
| Jul 2011 | 10,924 | 5,018 | 4,516 | 46% | 5% |
| Aug 2011 | 10,891 | 5,530 | 4,867 | 51% | 6% |
| Sep 2011 | 11,071 | 5,650 | 4,852 | 51% | 7% |
| Oct 2011 | 12,179 | 5,871 | 5,084 | 48% | 6% |
| Nov 2011 | 12,580 | 6,896 | 5,985 | 55% | 7% |
| Dec 2011 | 13,287 | 7,595 | 6,537 | 57% | 8% |
| Jan 2012 | 13,555 | 7,714 | 6,473 | 57% | 9% |
| Feb 2012 | 13,606 | 8,396 | 6,906 | 62% | 11% |
| Mar 2012 | 13,730 | 8,516 | 6,591 | 62% | 14% |
| Apr 2012 | 13,584 | 8,711 | 6,542 | 64% | 16% |
| May 2012 | 14,637 | 10,189 | 7,808 | 70% | 16% |
| Jun 2012 | 15,222 | 9,582 | 7,144 | 63% | 16% |
| Jul 2012 | 13,994 | 8,194 | 5,911 | 59% | 16% |
| Aug 2012 | 13,186 | 7,275 | 5,094 | 55% | 17% |
| Sep 2012 | 13,008 | 7,226 | 5,056 | 56% | 17% |
| Oct 2012 | 12,774 | 7,008 | 5,092 | 55% | 15% |
| Nov 2012 | 12,367 | 5,973 | 4,645 | 48% | 11% |
| Dec 2012 | 10,793 | 5,088 | 4,124 | 47% | 9% |
| Jan 2013 | 10,246 | 3,926 | 2,974 | 38% | 9% |
| Feb 2013 | 8,906 | 3,410 | 2,393 | 38% | 11% |

Testimony of Shok; Exhibits 127-152; Exhibits 154-179.

36. According to the Intake Reports, in February 2012, 13,606 Medicaid applications were pending at the end of the month, of which 8,396 were overdue. Therefore, 62% of Medicaid applications pending at the end of February 2012 were overdue. There were 6,906 pending overdue Medicaid applications that were overdue for "excused" delay. Of the pending overdue Medicaid applications, 11% were overdue because of "unexcused" delay. Testimony of Shok; Exhibit 140.

37. According to the Intake Reports, in May 2012, 14,637 Medicaid applications were pending at the end of the month, of which 10,189 were overdue. Therefore, 70% of Medicaid applications pending at the end of May 2012 were overdue. There were 7,808 pending over Medicaid applications that were overdue for "excused" delay. Of the pending overdue Medicaid applications, 16% were overdue because of "unexcused" delay. Testimony of

8

Shok; Exhibit 143.

38. According to the Intake Reports, in August 2012, 13,186 Medicaid applications were pending at the end of the month, of which 7,275 were overdue. Therefore, 55% of Medicaid applications pending at the end of August 2012 were overdue. There were 5,094 pending overdue Medicaid applications that were overdue for "excused" delay. Of the pending overdue Medicaid applications, 17% were overdue because of "unexcused" delay. Testimony of Shok; Exhibit 146.

39. According to the Intake Reports, in November 2012, 12,367 Medicaid applications were pending at the end of the month, of which 5,973 were overdue. Therefore, 48% of Medicaid applications pending at the end of November 2012 were overdue. There were 4,645 pending overdue Medicaid applications that were overdue for "excused" delay. Of the pending overdue Medicaid applications, 11% were overdue because of "unexcused" delay. Testimony of Shok; Exhibit 149.

40. According to the Intake Reports, in February 2013, 8,906 Medicaid applications were pending at the end of the month, of which 3,410 were overdue. Therefore, 38% of Medicaid applications pending at the end of February 2013 were overdue. There were 2,393 pending overdue Medicaid applications that were overdue for "excused" delay. Of the pending overdue Medicaid applications, 11% were overdue because of "unexcused" delay. Testimony of Shok; Exhibit 152.

41. According to the Intake Reports, in February 2013, there were 4,700 fewer total Medicaid applications pending at the end of the month in February 2012, a decrease of 35%. Testimony of Shok; Exhibit 140; Exhibit 152.

42. The total number of Medicaid applications pending at the end of the month has decreased by 12% since January 2011; in January 2011, 10,100 Medicaid applications were pending at the end of the month whereas in February 2013, 8,906 Medicaid applications were pending at the end of the month. Testimony of Shok; Exhibit 127; Exhibit 154; Exhibit 152.

43. The percentage of pending Medicaid applications that were overdue because of "unexcused" delays reached a two year high in September 2012 of 17%; by February 2013, the percentage of pending applications that were overdue because of "unexcused" delays dropped to 11%. Testimony of Shok; Exhibit 146; Exhibit 147; Exhibit 152.

44. The Application Length Pending Report cannot be used to determine if pending Medicaid applications are beyond the standard of promptness because it does not distinguish between applications with a 45 day standard of promptness and applications based on disability which have a 90 day standard of promptness. Testimony of Shok; Exhibit 153; Exhibits 154-179.

45. The Application Length Pending Report does not include Medicaid waiver applications in its count of Medicaid long term care applications. Testimony of Shok; Exhibits 154-179.

46. The Application Length Pending Report reports Medicaid LIA applications as SAGA applications. Therefore, the total number of Medicaid applications that are acted upon in a month or that are pending within a month can be obtained by adding the total number of SAGA medical applications and the total number of Medicaid applications. Testimony of Shok; Exhibits 154-179.

47. The Application Length Pending Report cannot be used to determine whether Medicaid applications received in a given month were processed within the standard of promptness. Testimony of Shok; Exhibits 154-179.

48. Because the Intake Reports do not report the number of Medicaid applications DSS actually processes within a month and because the Application Length Pending Reports do not report the number of Medicaid applications that are received within an identified month that are timely processed, DSS created a new report to measure timely processing for all Medicaid applications filed within one month – the Medicaid Application Timeliness Report. Testimony of Shok; Exhibit 181.

49. The Medicaid Application Timeliness Report (hereinafter "Timeliness Report") looks at an application's case status once the applicable standard of promptness has expired. The standard of promptness for most Medicaid applications is 45 days; the standard of promptness for Medicaid applications based on disability is 90 days. Testimony of Shok; Exhibit153; Exhibit 181.

50. The Long Term Care Medicaid applications are listed separately on the Timeliness Report because of the complex nature of the required review for improper transfers of assets during the five-year period preceding the date the application is filed. Testimony of Shok; Exhibit 153.

51. The State Supplement applications are listed separately on the Timeliness Report because historically, these Medicaid-related applications have not been included with the medical assistance figures in the Intake Report. Eligibility for State Supplement will automatically result in eligibility for Medicaid assistance. Testimony of Shok; Exhibits 127-152; Exhibit 153.

52. Because Long Term Care Medicaid applications and State Supplement applications are listed separately in the Timeliness Report, the percentage of timely processed applications under HUSKY Medicaid on the Timeliness Report does not include Long Term Care Medicaid applications and State Supplement applications. Testimony of Shok; Exhibit 153.

53. With the implementation of the new delay codes effective April 1, 2013, DSS will begin reporting the number and percentage of delays that are "excused" due to unusual circumstances. Because the Timeliness Report is not released until after the standard of promptness has expired for all applications filed within a given month, the first Timeliness Report containing the number of "excused delays" is expected to be released approximately August 2013. Testimony of Shok.

10

54. The Timeliness Report for November 2011 through November 2012 indicates that DSS is processing increasingly more applications within the time standard. For instance, of the 22,390 Medicaid applications filed in November 2011, 16,001 were processed within the standard of promptness. This means that 71.46% of applications filed in November 2011 were processed within the standard of promptness. In November 2012, however, of the 22,895 Medicaid applications filed from November 1, 2012 through November 30, 2012, 19,244 were processed within the standard of promptness. This means that 84.05% of applications filed in November 2012 were processed within the standard of promptness. Testimony of Shok; Exhibit 181.

55. In a context similar to Medicaid application processing, the Food and Nutrition Service ("FNS"), the federal oversight agency for the Supplemental Nutrition Assistance Program ("SNAP"), evaluates application processing timeliness when awarding bonuses to participating states. Testimony of Shok; Exhibit 182.

56. For purposes of the SNAP bonus program, FNS calculates timeliness by dividing the number of cases timely processed by the number of cases subject to the timeliness measure. Testimony of Shok; Exhibit 183.

57. When determining the number of cases subject to the timeliness measure, "[o]nly applications filed on or after the beginning of the performance measurement (fiscal) year will be evaluated under this measure." Testimony of Shok; Exhibit 182.

58. In deciding how to measure timeliness, FNS specifically considered and rejected counting all active applications pending at the beginning of the performance measurement. Testimony of Shok; Exhibit 184.