<u>**DEFENDANT'S PROPOSED CONCLUSION OF LAW**</u>

     1.    Notwithstanding that an administering state agency cannot excuse a violation of "individual rights" by citing budgetary limitations, <u>Ala. Nursing Home Ass'n v. Harris</u>, 617 F.2d 388 (5th Cir. 1980), the text and structure of the federal Act repeatedly recognize that state resources are limited and that limited resources may legitimately be taken into account in designing a state's Medicaid program. See, 42 U.S.C. § 1396 (purpose of program is to enable each state "as far as practicable under the conditions in such State" to furnish medical assistance); 42 U.S.C. § 1396a(a)(4) (provide for methods of administration including use of personnel "as are found by the Secretary to be necessary for the proper and efficient operation of the plan"); 42 U.S.C. § 1396a(a)(30)(A) (Medicaid payments must be consistent with "efficiency and economy"); <u>In re NYAHSA Litig.</u>, 318 F. Supp. 2d 30, 41 (N.D.N.Y. 2004) (controlling costs is "a legitimate and laudable objective of the State.")

     2.    42 U.S.C. § 1396a(a)(8) is administratively enforceable by the federal Secretary but does not clearly and unambiguously confer enforceable "individual rights" to reasonably prompt application processing under the standards of <u>Gonzaga University v. Doe</u>, 536 U.S. 273 (2002) and <u>Taylor v. Vermont Dep't of Education</u>, 313 F.3d 768 (2d Cir. 2002), due to the absence of individually-focused, rights-creating statutory text and the statutory delegation of enforcement responsibility to the federal Secretary under the substantial compliance standard of review. See, Defendant's Motion to Dismiss papers. Accordingly, judgment must enter for the defendant on plaintiffs' "reasonable promptness" claims.

     3.    In order to establish eligibility, applicants for assistance must produce information and verifications establishing that all of the applicable factors of eligibility are satisfied. 42



U.S.C. § 1320b-7, 42 C.F.R. §§ 435.940 through 435.965. Depending on how the client applies for Medicaid, i.e., in which coverage group, numerous factors of eligibility may need to be verified. 42 U.S.C. § 1396a(a)(10) Applicants for assistance bear the burden of establishing eligibility, including producing "verification" of each factor of eligibility where required. Lavine v. Milne, 424 U.S. 555 (1976); DeSario v. Thomas, 139 F.3d 80, 96 (1998).

### Class Certification

4.     For the present case to be certified as a class action, the plaintiff must satisfy the four prerequisites of Fed. R. Civ. P. 23(a) and at least one of the conditions of Rule 23(b). Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 163 (1974).

5.     Rule 23(a) requires a class representative(s) to demonstrate that: (1) the class is so numerous that joinder of all member is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

6.     Rule 23(b)(2), upon which the plaintiffs' rely to justify certification of a class and subclass in the present case, provides, "(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if: ***(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole ***"

7.     The named plaintiffs must be members of the class. O'Shea v. Littleton, 414 U.S. 488 (1974).

2

8.      The named representative plaintiff must "link their claims with those of the putative class," and demonstrate "that there are other members of the class who have the same or similar grievances as the plaintiff." Price v. Cannon Mills, 13 F.R.D. 66, 68-69 (M.D.N.C. 1986).

### Lack of Medically Needy Class Representative – Impact on Class Certification

9.      Plaintiffs have alleged that Joshua Harder is a "medically needy" Medicaid recipient that is subject to a six month "spend down" requirement that obligates him to submit documentation of compliance with the six month spend down amount. Plaintiffs allege that Ms. Marguerite Madden submitted documentation, on behalf of Mr. Harder, to DSS in October 2011 in compliance with his six month spend down amount for the period covering July 1, to December 31, 2011 and DSS did not provide him with Medicaid coverage for this period. Mr. Harder has no first-hand knowledge whether Ms. Madden submitted this documentation.

10.     DSS disputes the facts alleged by the plaintiff that Marguerite Madden submitted the bills to DSS.

11.     DSS did not receive the documentation that Mr. Harder alleges was provided to DSS in October 2011.

12.     Accordingly, plaintiffs have failed to name a class representative of medically needy recipients, such that this Court may not properly certify a sub-class of medically needy individuals who allegedly have submitted medical expenses but not received a reasonably prompt determination of their eligibility as medically needy.

**Unusual Circumstances Impact on Definition of any Certified Class**

13.     42 C.F.R. § 435.911(c) provides that the "normal" regulatory "standard of

promptness" of 45 or 90 days does not apply in "unusual circumstances." This regulation does

not define "unusual circumstances," but provides as an illustrative example of "unusual

circumstances" the situation "[w]hen the agency cannot reach a decision because the applicant or

an examining physician delays or fails to take a required action." 45 C.F.R. § 435.911(c)(1).

14.     Applicants whose eligibility determination has been delayed because of "unusual

circumstances" must be excluded from the class definition because they do not have similar legal

and factual claims that apply generally to the proposed class. Rule 23(a) and 23(b)(2).

**Issuance of Adverse Action Notices at the Standard of Promptness in the Event of Delay – Plaintiffs; Statutory, 42 U.S.C. § 1396a(a)(3), and Constitutional Due Process Claims to "Notice"**

15.     Plaintiffs fail to state a claim upon which relief can be granted insofar as they

claim that 42 U.S.C. § 1396a(a)(3) requires the defendant to issue a notice, with hearing rights, at

the standard of promptness in the event that an eligibility determination has not been made. The

federal regulations implementing 42 U.S.C. § 1396a(a)(3) only require the issuance of notices

with hearing rights in the event of "adverse action" constituting denials or terminations, and not

in the event of a failure to make an eligibility determination within the standard or promptness.

See the implementing "fair hearing" regulations at 42 C.F.R. §§ 431.206(b)(and (c), requiring

adverse action notices to be sent at the time of any "action" on a claim, and 42 C.F.R. § 431.201,

defining "action" as including "termination, supervision, reduction or discharge." Also see the

implementing federal "timely processing" regulations, notably 42 C.F.R. § 435.911, which

requires the agency to "document the reasons for delay in the applicant's case record," and 42

4

C.F.R. § 435.912 which requires the agency to send "a written notice of the agency's <u>decision</u> on his application, and <u>if eligibility is denied</u>, the reasons therefore."

16.     This Court is required to defer to the implementing federal regulations for purposes of defining the scope of any "individual right to notice" that may be created by 42 U.S.C. § 1396a(a)(3). <u>D.D. v. New York City Bd. of Ed.</u>, 465 F.3d 503, 513 (2d Cir. 2006); <u>Shakhness v. Berlin</u>, 689 F.3d 244 (2d Cir. 2012). Those regulations do not require "notice" in the event of "delay" at the standard of promptness.

17.     Notwithstanding that the federal regulations do not require "notice in the event of delay," it is the policy and practice of the defendant to cause notices to be routinely issued through the Department's eligibility management system at the standard of promptness in the event of delayed applications. The notices advise the applicant of the reason for the delay and inform the client of the opportunity to request an administrative fair hearing. Accordingly, no violation of 42 U.S.C. § 1396a(a)(3) or the requirements of due process of law can be shown.

18.     Implementing federal regulations specifically require administering state agencies to record the reason for any delay in determining eligibility in the client's eligibility file at the expiration of the standard of promptness. 42 C.F.R. § 435.911(d). The reason for the delay provided to the client in the notice that is issued at the standard of promptness is the same reason that is entered by the eligibility worker in the client's eligibility file.

19.     The defendant Commissioner and managerial employees of the Department at the Commissioner's direction issued several directives to Department staff emphasizing the importance of entering delayed reason codes accurately, provided training to staff on the use of proper delay reason codes, and conducted supervisory reviews of the accuracy of the reason codes entered by eligibility workers. Under such circumstances, where the policy of the

5

defendant Commissioner is that correct delay reason codes must be utilized, the defendant Commissioner is not responsible for individual errors that may be entered by individual eligibility workers as to the reason for delay. Therefore, declaratory or injunctive relief may not be entered against the defendant Commissioner as a result of any such individual errors, such as the erroneous reason code that was entered on the notice that was issued to plaintiff Shafer at the expiration of the standard of promptness for processing his application for assistance. Rizzo v. Goode, 423 U.S. 362 (1976); Daniels v. Williams, 474 U.S. 327 (1986); Williams v. Smith, 781 F.2d 319 (2d Cir. A986).

20. Alternatively, an eligibility worker's entry of an erroneous delay reason code does not constitute a violation of 42 U.S.C. § 1396a(a)(3) or a violation of the requirements of due process of law because those provisions do not guarantee that the agency will be free from error, but, instead, only provide a method to review claims of error.

### Medically Needy Spend-Down Claims Pursuant to 42 U.S.C. § 1396a(a)(8)

21. Determining whether submitted "medical expenses" qualify for "spend-down" purposes requires the Department, at a minimum, to determine whether the submitted documentation constitute "medical expenses incurred by the individual ... that are not subject to payment by a third party." 42 C.F.R. § 435.831(d). In addition, the agency must consider the time period when the medical expense was incurred, and whether the same bill has previously been submitted to the state agency and counted for spend-down purposes. 42 C.F.R. §§ 435.831(e) and (f). See also defendant's Proposed Findings of Fact regarding the issues that must be determined, and verifications required, before a determination can be made as to whether a submitted expense qualifies for spend-down purposes.

22. Federal statute and implementing federal regulations do not provide any specific time standard for the state to process submitted medical expenses for "medically needy" eligibility purposes. In the absence of any specific federal statutory or regulatory "standard of promptness" for processing submitted medical expenses, the states have wide discretion to fill the gap in the federal regulation by adopting their own requirements for the timely processing of medical expenses, which state rules must be respected as long as they are generally consistent with the purposes of federal law. New York State Dep't of Social Services v. Dublino, 413 U.S. 405 (1973).

23. Connecticut has adopted a regulation, U.P.M. 1555.30.B.2, which adopts a standard of promptness of thirty days for "Interim Changes," which regulation applies by its terms to the processing of submitted medical expenses for medically needy eligibility purposes.

24. There is insufficient evidence in the record, especially given the evidence in the record documenting the difficulty of determining whether submitted medical expenses qualify for spend-down purposes, that would allow this Court to strike down the application of the thirty-day period established in state regulation for Interim Changes as a permissible standard governing whether medical expenses are processed with reasonable promptness.

25. In the absence of any federal statutory or regulatory guidance on what constitutes "reasonable promptness" to process medical expenses for medically needy, spend-down purposes, the statutory standard of "reasonable promptness" is "too vague and amorphous," such that this Court respectfully lacks judicial competence to establish a standard of promptness by judicial fiat for processing medical expenses that would apply solely to Connecticut, and not to any other participating state. Blessing v. Freestone, 520 U.S. 329 (1997).

7

26.     If this Court finds that the thirty-day "Interim Change" state regulatory standard of promptness is not reasonable as applied to the processing of medical expenses for medically needy purposes, and if this Court finds judicial competence exists for this Court to set a time standard in the absence of federal regulatory guidance, then any such judicially imposed time standard may not be based upon the time that is typically taken by other states.  Rather, this court would be required to determine on its own, based upon the factual circumstances presented, the requirements of federal law.  Cleveland  Bd. of Ed. v. Loudermill, 470 U.S. 532 1985) (The requirements of due process of law are not defined by any state statute or regulation, but must be independently determined by the court.)

27.     A reasonably prompt time frame to process medical expenses for purposes of determining the eligibility of the medically needy cannot be established by reference to policies adopted by two states, Ohio and Missouri, "cherry-picked" by plaintiffs for the following reasons:  (1) there has been no showing that these policies are representative of the policies and practices of other states;  (2) plaintiffs misrepresent the "start date" of the "standard of promptness" adopted in policy by those two states (don't run on submission of medical expenses as erroneously represented by plaintiffs, but only on submission of all information necessary to determine eligibility); and (3) those states employ one month spend-down periods, which typically require consideration of much fewer medical expenses in comparison to the six-month spend-down period employed by Connecticut.

28.     Similarly, the experience of the recent DSS/XEROX spend-down project wherein XEROX is contractually required to process submitted expenses to a determination within five business days after the expenses are received by XEROX (three additional days allowed when the expenses are mistakenly sent directly to the Department) does not afford a basis for this

Court to judicially establish a "standard of promptness" for processing medical expenses for several reasons, including: (1) respectfully, this Court may not assume that the DSS/XEROX contract, which essentially requires unlimited resources to be employed to do the job on a "cost plus" basis, will be extended or that resource limitations will not be more of a factor in the future; (2) even under the DSS/XEROX spend-down project, there were 140 "outliers" which took more than five business days to process in February, 2013, a month in which DSS/XEROX processed over 97% of submitted medical expenses within five business days. Any standard of promptness judicially adopted by this Court would constitute a universal "individual entitlement," with the Department being potentially liable for the violation of "individual rights" for each spend-down case that was not processed within the judicially imposed standard of promptness. Any judicially imposed standard of promptness must be consistent with the fact that the Court would be creating "individual entitlements" which must be met in every case, and the reality that a number of individual cases will present additional difficulties and require additional time to process.

29.    It is respectfully submitted that if the thirty-day state regulatory Interim Change period is rejected by this Court as being unreasonable, and if this Court finds judicial competence, any time standard for processing medical expenses adopted by this Court should be at least fifteen business days (or at least ten business days, with three additional business days allowed where the medical expenses are not submitted by the client to the Department in the manner directed by the Department). The fifteen-day period is reasonable when the court takes into account the following: (1) the administrative difficulty in processing spend-down cases; (2) assistance can be granted retroactively to the date on which the last medical expense was incurred that satisfied the six-month spend-down obligation; and (3) the option of the client to

9

"carry over" the incurred medical expenses to the first day of the next six-month spend-down period, possibly resulting in eligibility immediately on the first day of the successive six-month spend-down period. Furthermore, any judicially imposed time standard should allow the Department (consistently with the current DSS/XEROX protocols) to deny recognition of submitted medical expenses because insufficient information or verification was submitted with the medical expenses in order to allow eligibility to be determined, notwithstanding that eligibility could be established later if and when additional information is submitted.

30.     Alternatively, the evidence establishes that the Department, with the assistance of XEROX, is currently processing medical expenses with reasonable promptness. Accordingly, in the absence of an "ongoing violation," this Court should simply enter judgment for the defendant on the § 1396a(a)(8) timely processing of medical expenses claim, and decline to enter any prospective declaratory of injunctive relief, specifically including any judicially-created individual entitlement to have each individual's medical expenses adjudicated within any particular standard of promptness that may be established by the Court by judicial decree.

**Unenforceability of the § 1396a(a)(8) Reasonable Promptness Regulation, 42 C.F.R. § 435.911, as Applied to Medicaid Applicants Seeking Long-Term Care Assistance, Including Both Nursing Facility Services and Alternative Home and Community-Based Waiver Services**

31.     Federal agencies are subject to an affirmative obligation to periodically review and update their regulations in light of changed circumstances. Detsel v. Sullivan, 895 F.2d 58 (2d Cir. 1990); American Trucking Assns. V. Atchison T. & S. F. Ry., 387 U.S. 397, 416 (1967).

32.     The federal regulation implementing the "reasonable promptness" requirements of 42 U.S.C. § 1396a(a)(8) by setting 45 or 90-day standards of promptness (depending on whether

disability is a factor in determining eligibility) that applies except in "unusual circumstances," 42

C.F.R. § 435.911, is illegal and unenforceable at least as applied to the processing of applications

for Medicaid long-term care assistance as a result of the administering federal agency's failure to

review and update the standards of promptness to take into account changed circumstances,

notably including intervening changes in the requirements of federal law, including, but not

limited to, the adoption and progressive lengthening and tightening of mandatory federal transfer

of asset rules, 42 U.S.C. § 1396p, and the adoption of eligibility rules that require administering

state agencies to take into account the assets of community spouses in determining the eligibility

of the institutionalized spouse. See 42 U.S.C. § 1396r-5.

### Plaintiffs § 1396a(a)(8) Reasonable Promptness Claims - Unusual Circumstances

33.     Any purported "individual right" to "reasonably prompt" application processing

does not apply to applicants for assistance where "unusual circumstances" are present within the

meaning of 42 C.F.R. § 435.911(c) since the scope of a purported right to reasonably prompt

application processing allegedly conferred by 42 U.S.C. § 1396a(a)(8) is "fleshed out," and

defined by, the implementing regulations, D.D., supra, Shakhness, supra, and the implementing

regulations make the time standards of 42 C.F.R. § 435.911 inapplicable where "unusual

circumstances" are present.

34.     42 C.F.R. § 435.911(c) does not purport to provide an explicit definition of

"unusual circumstances," and only provides illustrative examples. The illustrative examples

provided include where "the applicant or physician delays or fails to take required action," and

when there is an "administrative or other emergency beyond the agency's control." There is no

requirement in § 435.911(c) that in order for a delayed application to be considered excused by

11

unusual circumstances that the agency must have made an initial request for verifications by any date certain in order for the unusual circumstances provision to apply.

35. Under the rule of <u>Dublino</u>, <u>supra</u>, 413 U.S. 405, the states has wide discretion to "fill the gap" left by Congress and the administering federal agency to develop their own policies as to what constitutes "unusual circumstances" that excuse any failure to process an application with reasonable promptness, as long as the state policies are consistent with the purposes of the Act, as determined by reference to the types of situations recognized by the illustrative examples in the implementing regulations.

36. The requirements of the "<u>Alvarez</u>" stipulations are not binding and are of no effect since that action was never certified as a class action.

37. Accordingly, plaintiffs' reliance on the terms of an <u>Alvarez</u> stipulation as the basis for a purported requirement that verifications must have been requested within seven days of the application being received in order for any subsequent delay to be "excused" by "good cause" or "unusual circumstances" is without any basis in law.

38. Furthermore, the <u>Alvarez</u> stipulation was the result of a negotiated agreement where the parties agreed to a mutually acceptable resolution that contained terms, to each party's advantage and disadvantage, that may not otherwise have been obtained if the case had been resolved by the Court through litigation. Under these circumstances, plaintiffs cannot renounce the agreement as a whole, including, for example, the "substantial compliance" standard provided for therein, while relying on a term of the renounced stipulation as the "basis" for a purported requirement that verifications must have been requested within seven days of the application being filed in order for the unusual circumstances exception of 42 C.F.R. § 435.911(c) to be applicable.

39. Any purported requirement based on the <u>Alvarez</u> stipulations to request verifications within seven days in order for any subsequent delay to be excused by good cause/unusual circumstances was not implemented by the defendant and is not reflected in the Department's regulations or in its implementing instructions defining good cause circumstances for delay.

40. The illustrative examples of 42 C.F.R. § 435.911(c) of unusual circumstances provide no basis in law for this Court to judicially impose a requirement, applicable only to Connecticut, that initial verifications must have been requested with seven days in order for any subsequent delay attributable to client or to third-party failure to provide necessary information to be excused by good cause/unusual circumstances.

41. The agency's past directives describing excused and unexcused delay reason codes, and, more significantly, the agency's recent directives clarifying and defining unusual circumstance delay codes, effective April 1, 2013, are consistent with the meaning of "unusual circumstances" in federal law, 42 C.F.R. § 435.911(c), and must be given effect. Specifically, the agency's revised "unusual circumstances" policies, effective April 1, 2013, excuse delay that is properly attributable to client or third party delay in producing necessary information and verifications, provided that the agency initially requested verifications within twenty days of the date of receipt of the application for assistance. The Department's twenty-day time limit for requesting verifications is consistent with the purpose behind the unusual circumstances provision of 42 C.F.R. 435.911(c) because it allows the applicant the opportunity to have eligibility determined within the standard of promptness if s/he produces the requested verifications timely, but allows delay in determining eligibility to be properly excused and

attributable to applicant or third-party delay if the applicant does not timely produce the requested verifications.

42.     Plaintiffs' claim that it is "more likely" that eligibility will be determined within the 45 or 90-day standard of promptness if initial requests for verification are issued by day seven would further support an even more stringent, and even more unreasonable, requirement that verification requests must go out on day one in order for any subsequent delay due to the client or to a third-party delay to be excused.  Plaintiffs' proposed seven day requirement is unrealistic given the demands on the agency and the reality of limited resources, and improperly conflicts with the purposes of the unusual circumstances provisions by improperly holding the agency accountable for delay that is properly attributable to client or third-party delay in producing information and verifications, where the agency is processing the application in a manner that is calculated to produce a timely eligibility determination if the applicant and third parties timely produce requested verifications.

### 42 U.S.C. § 1396a(a)(8) - Timely Application Processing

43.     The defendant has traditionally maintained and reported two different monthly reports that provide information on its processing of applications, namely its monthly "Intake Report," a/k/a its "Alvarez Report," and its ""Application Length Pending Report."  Neither of these reports measures the extent to which the Department processes applications timely, within the applicable standard of promptness.

44.     The Intake Report counts the total number of applications pending at the end of each month, the number and percentage of those month-end pending applications that are "overdue," and the number and percentages of such delayed applications that are pending at the end of the month where the delay is excused by good cause constituting "unusual

14

circumstances." The Intake Report does not take into account the number of applications filed in the month, or the number of applications processed to an eligibility determination within the month.

45.     Notwithstanding that the Intake Report does not measure the timeliness of application processing, it shows that the Department has made substantial progress reducing the number of Medicaid applications that were pending at the end of the month from a high of 15,222 at the end of June, 2012, to 8,906 at the end of February, 2013; and reducing the number of applications that were "overdue" (excused or unexcused) at the end of the month from a high of 10,189 at the end of May, 2012, to 3,410 at the end of February, 2013.

46.     Of the 3,410 applications that were "overdue" at the end of February, 2013, only 11% of those overdue applications were considered delayed for "unexcused" reasons by the Department, based on the reason code entered by the eligibility worker in the client's file in accordance with the requirements of 42 C.F.R. § 435.911(d).

47.     A second report, the Application Length Pending Report, does not distinguish between applications with a 45 and 90-day standard of promptness, and does not take into account the reasons for the delay, excused or unexcused. The Application Length Pending Report also does not count the number of Medicaid applications received in a month that were processed within the applicable standard of promptness.

48.     Because the Intake Report and the Application Length Pending Report do not measure the extent to which applications received in a month were processed timely, within the applicable standard of promptness, and do not measure the extent to which delayed applications are excused by "unusual circumstances," the Department recently developed a new "Timeliness

Report" which is designed to measure the timeliness of the processing of all applications filed within a month, by reference to the applicable standard of promptness.

49.     There is a several month delay in recording the percentage of applications filed in a month that were processed timely because of the need to wait 90 days following the end of the referenced month to determine what percentage of applications were timely filed, within the standard of promptness. The most recent available data indicates that 84.09% of the 22, 895 Medicaid applications filed in November, 2012 (excluding long term care and state supplement applications), or 19,244 of such applications, were processed timely, within the applicable standard of promptness.

50.     The Timeliness Report does not yet measure the extent to which delayed applications are excused by "unusual circumstances." Following the implementation of the new delay reason codes, effective April 1, 2013, the extent to which delayed applications filed in April, 2013, and in succeeding months are excused by "unusual circumstances" will be known in approximately August, 2013, following the expiration of the 90-day standard of promptness.

51.     Looking at the percentage of pending overdue end of month applications that are considered excused by "unusual circumstances" as disclosed by the monthly Intake Reports, it is reasonable to infer that a substantial percentage of the approximately 16% of applications filed in November, 2012 (excluding long term care and state supplement applications) that were not processed timely are likely to be excused by good cause constituting "unusual circumstances." Specifically, it is reasonable to infer that the defendant is currently in at least "substantial compliance" with any assumed "individual right" of class members to have their applications processed timely, in the absence of unusual circumstances.

16

52.     By analogy, as recognized by the Food and Nutrition Service of the Department of Agriculture for timely food stamp application processing, in order to measure the timeliness of application processing, it is necessary to look at all applications filed in a month and to determine what percentage of those applications were processed timely. Only the new Timeliness Report measures the timeliness of application processing by that measure.

53.     This Court must give effect to the "unusual circumstances" provisions, and may not hold the defendant responsible for delayed applications that properly may be considered excused by "unusual circumstances" within the meaning of 42 C.F.R. § 435.911(c), including delays attributable to client or third-party failure to timely produce requested information and verifications.

<h3 align="center">Limitations on the Scope of Injunctive Relief</h3>

54.     Injunctive relief "should be narrowly tailored to fit specific legal violations." Patsy's Ital. Res. Inc. v. Banas, 658 F.3d 254, 272 (2d. Cir. 2011)(internal citations omitted).

55.     A court's power to grant injunctive relief is an "extraordinary" power and as such, should be used infrequently in 'clear and plain' cases. Reynolds v. Giuliani, 506 F.3d 183, 198 (2d. Cir. 2007).

56.     A court should exercise even more restraint when it "is asked to interfere by means of injunctive relief with a state's executive functions, a sphere in which states typically are afforded latitude. . . In such cases, we must keep in mind the 'integrity and function' of state institutions, as well as the delicate balance that must be maintained between a federal court's exercise of its equitable power and a state's administration of its own affairs." Id.

57.     Any relief that this court grants must correspond with the degree of the state's alleged non-compliance with federal standards that exists as of the day the relief is granted.

Chemical Corp. of America v. Anheuser-Busch, Inc., 306 F.2d 433, 439 (1962) ("An equity court, in considering injunctive relief, views the case as of the time of the granting of the relief.")

58.     Generally, courts only grant injunctive relief to prevent future violations of laws. U.S. v. Oregon State Medical Soc., 343 U.S. 326, 333 (1952)(emphasis added). This is doubly true when the moving party is seeking an injunction against the state as a result of federalism principles and the requirements of the Eleventh Amendment. Green v. Mansour, 474 U.S. 64, 67 (1985).

59.     When a party seeks an injunction against the state to stop present violations of law and prevent future violations of law, the Eleventh Amendment to the Constitution of the United States bars relief against a state that is "retrospective in nature." Id. at 67-68 (1985) ("Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.") Therefore, to successfully obtain an injunction against the state, there must be an ongoing violation of law at the time that the injunction is sought and granted. Id. at 71.

60.     Because injunctions generally are intended to address future violations of law and because the Eleventh Amendment bars the plaintiffs from obtaining retrospective relief from the state, any relief that the court grants to the plaintiffs should correspond with the level of violation of federal standards that the plaintiffs are able to prove exists as of the day that relief is granted.

## Substantial Compliance Standard for Enforcement

61.     Under the Medicaid statute, as with other spending clause legislation, entities that receive federal funding do not risk losing federal funds for every violation. Rather, under the

structure of the Medicaid statute, states can avoid termination of funding by demonstrating that they have <u>substantially complied</u> with the statutes funding obligations. (Emphasis added) See <u>Gonzaga</u>, supra, at 288, quoting <u>Blessing</u>, <u>supra</u>, 520 U.S. at 344.

62.     42 U.S.C. § 1396c provides in relevant part: "If the Secretary . . . finds--. . .  (2) that in the administration of the plan there is a failure to <u>comply substantially with</u> any such provision; the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply." (Emphasis added.)

63.     The "substantial compliance" standard that must be used to measure an entity's compliance with federal law weighs in favor that the <u>structure</u> of the federal legislation counsels against concluding that Congress unambiguously conferred a privately enforceable right. <u>Gonzaga</u>, supra, 536 U.S. at 288-290; <u>Sabree v. Richman</u>, <u>supra</u>, 367 F.3d 180, 191-92 (2004). Significantly, in <u>Gonzaga</u>, the Supreme Court discussed the significance of the "substantial compliance" standard in FERPA's enforcement provision (a different provision from that relied upon by the plaintiff in <u>Gonzaga</u> as the source of the federal right) in concluding that FERPA weighed against a finding that Congress intended to confer individual rights. <u>Id.</u>

64.     In the event the court determines that the plaintiffs have an individual right that is enforceable through § 1983, the court must nevertheless use a substantial compliance standard to determine whether there has been a violation.  See, e.g., <u>Doe v. Blum</u>, 729 F.2d 186, 188, 190 n6, 194-95 (2d Cir. 1984); <u>Shands v. Tull</u>, 602 F.2d 1156, 1160 (3d Cir. 1979); <u>Karen L. v. Health Net</u>, 267 F. Supp. 2d 184 (D. Conn. 2003); <u>Roberta G. Perales</u>, 1992 U.S. Dist. LEXIS

19

16304 at *14 (S.D.N.Y. Oct. 23, 1992); Moore v. Pearles, 692 F. Supp. 137, 143-44 (E.D.N.Y. 1988).

65.     Since the Secretary may only take corrective action against a state that fails to "comply substantially" with the provisions of the Medicaid law, the "substantial compliance" standard must apply when federal courts examine whether states have violated a provision of the Medicaid statute.  Otherwise federal courts, and private litigants, would be holding the state to a higher standard than that imposed on them by Congress, and by the federal agency charged with overseeing the programs.  See Shands, supra, 602 F.2d at 1160; see also Withrow v. Concannon, 942 F.2d 1385, 1390 (9th Cir. 1991) (Trott, J., dissenting) ('If Congress is satisfied to spend its money to support a program that complies 'substantially' with its expectations, why do we demand more?")  See also, Bailey v. Roob, 567 F.3d 930, 937 (7th Cir. 2009).

66.     D.D. v. New York City Board of Ed., 456 F.3d 503 (2d Cir. 2006) is inapposite to the present case because it did not involve judicial examination of public assistance programs in litigation brought by private parties. D.D., supra, also is not applicable to the present case because there was no dispute between the parties in that case as to whether a provision of IDEA created an individual, enforceable right.  The parties relied upon the Supreme Court's holding in Honig v. Doe, 484 U.S. 305, 310 (1988), which pre-dated the Supreme Court's holding in Blessing, and Gonzaga.  Moreover, it does not appear that there was even a dispute among the parties in Honig v. Doe, as to whether there existed an individual, enforceable right under the Education of the Handicapped Act, the precursor to IDEA. D.D., supra, 465 F.3d at 511 n.9. See Blanchard v. Morton School District, 509 F.3d 934 (3rd Cir. 2007) (discussing D.D., supra, decision failed to discuss congressional intent at all.).  In contrast, this case arises out of the Social Security Act and there is a substantial dispute as to whether 42 U.S.C. § 1396a(a)(8)

20

creates enforceable individual rights to reasonably prompt application processing.  Under such circumstances, allowing a proposed class represented by a "private Attorney General" to obtain complete relief on behalf of all applicants for assistance under an implied cause of action does violence to the explicit statutory scheme which only expressly contemplates enforcement by the federal Secretary under the substantial compliance standard of review.

21

67.